HENRY F. HALL vs. THE NORWALK FIRE INSURANCE COMPANY.

New Haven Co., June T., 1888. PARK, C. J., CARPENTER, PARDEE, LOOMIS and BEARDSLEY, Js.

Five fire insurance companies insured property of the plaintiff, which was burned, and the plaintiff and the insurance companies (the latter acting together) submitted the question of the amount of the loss to two arbitrators, who made an award of the amount due from all the companies to the plaintiff. In a suit brought against one of the companies on its policy, to which the defendant pleaded that all the companies had together tendered the plaintiff the amount awarded, it was held that the plea was not insufficient in not alleging a separate tender of the particular sum owed by the defendant as its share of the amount awarded.

The defendants' plea averred that the companies had repeatedly tendered to the plaintiff the amount awarded in satisfaction of the award. Upon the evidence it appeared that the tender was unconditionally made. Whether the words "in satisfaction" in the averment, import a conditional tender: Quære. If they do, the plaintiff could take advantage of the insufficiency of the averment only by a demurrer to the plea.

Where an agent, without sufficient authority, submits a matter to arbitra-

tion, and the principal after the award ratifies the agent's act, the other party is bound by the submission and award although the principal had the opportunity to know what the award was when he ratified the act of his agent.

A policy contained a provision for the submission to arbitration of the question of the amount of a loss under it and some details with regard to the submission. Held not to be intended to prescribe a form of submission that must be exactly followed.

And that if it did, the parties had yet the right to make a submission in any form they pleased.

It has always been held, both by the courts of England and of this country, that agreements for arbitrations to settle particular questions, such as the amount of damages, or of a loss by fire under policies of insurance, are binding in law and favored by the courts.

Arbitrators are not bound to follow strict rules of law unless it be a condition of the submission that they shall do so.

If arbitrators have acted in good faith, neither party will be permitted to avoid the award by showing that they erred in judgment as to the facts.

Arbitrators selected by reason of special knowledge or skill with reference to the matter in controversy, so that it is manifest that the parties intended to rely on their personal information, investigation and judgment, may be justified in refusing altogether to hear evidence.

One of two arbitrators, to whom as experts was submitted the ascertainment of the amount of loss from the burning of an insured building, inquired for his own information, in the absence of the parties, and of the other arbitrator, as to the prices paid for labor in the place. Held not a reason for setting aside the award, unless it appeared that the party complaining was prejudiced or the decision affected thereby.

The methods of an arbitrator in reaching his conclusions are not a proper subject of inquiry.

[Argued June 18th—decided July 20th, 1888.]

ACTION on a policy of fire insurance; brought to the Court of Common Pleas of New Haven County, and heard before *Hall, J.* Facts found and judgment for the defendant and appeal by the plaintiff. The case is fully stated in the opinion.

*H. G. Newton,* with whom was *C. Kleiner,* for the appellant.

*W. L. Bennett* and *G. A. Fay,* for the appellee.

LOOMIS, J. This is a suit to recover one thousand dollars, the amount insured in a policy of insurance against loss by

fire, issued by the defendant company upon a frame building belonging to the plaintiff, situated in Wallingford.

There is no question as to the validity of the policy, or the fact of the loss by fire, but the amount of loss and the mode of its adjustment is the subject of much contention. The policy in suit provided that in case there was other insurance existing on the same property the defendant should not be liable to pay any greater proportion of the loss than the sum insured in it bears to the whole amount insured thereon; and the record shows that there were at the time of the loss four other policies in as many different companies on the same property.

The policy in suit also contained the following provision: " Payment of losses shall be made in sixty days after such proofs of loss shall have been received at the office; and in case differences shall arise touching any loss or damage after proof has been received in due form, it shall be submitted, upon the written request of either party, to the judgment of two arbitrators, one to be chosen by the company and one by the insured, with power if they do not agree to themselves choose a third, and shall together examine and under oath appraise the sound cash value of all damaged property shown to them and the cash damage done to the same by the fire, and the award made in writing and signed by any two of the arbitrators shall be binding on the parties, each party paying one half the expense of reference, but the award shall not determine any question as to the liability of this company under this policy."

The defendant for answer pleaded two distinct defenses, but as the court found the issue for the defendant only on the first, no other need be considered. In this was set forth the fact that four other fire insurance companies, the names of which are given, had policies on the same building at the time of the fire, and that after the loss, on February 26th, 1885, the plaintiff and defendant, together with the four other insurance companies, executed a written submission of the demand in the complaint, together with all the demands against the defendant and the other companies named,

arising on account of the fire, to the arbitration of Henry L. Morehouse and John C. Mead, with power to choose a third person as umpire if necessary, making a full copy of the agreement also a part of the allegations; that the parties agreed to abide by the award rendered, and afterwards, and before the commencement of the action, the arbitrators did make their award, and thereby awarded to the plaintiff in all the sum of $4,900, as his just and true damages and the total amount of his loss by fire, and that both the submission and award embraced the risk and loss insured against by the defendant upon the property of the plaintiff; and further alleging that the defendant, in behalf of itself and said four other insurance companies, then and there was, and ever since then has been, willing and ready to pay the plaintiff said amount of $4,900, and is now ready and willing to pay in behalf of itself and said four other insurance companies said award of $4,900, in satisfaction of said supposed loss of the plaintiff, if he would receive the same; and has repeatedly tendered the same to the plaintiff, who heretofore and still refuses to receive said sum in satisfaction of said award; and the defendant also has ever been and now is ready and willing to perform said award and to pay its *pro rata* of said award to the plaintiff if he will accept the same."

The plaintiff made an elaborate and voluminous reply, tendering divers issues of fact to impeach the award, the principal allegations being, in substance, that the submission upon which the award was based was obtained conditionally and by false representations, and that the arbitrators conducted themselves as against the plaintiff unfairly, partially and corruptly. The court however found all these allegations of fact against the plaintiff and found the answer true. This adverse finding of the issues of fact would ordinarily eliminate most of the questions of law; but not so here, for the plaintiff makes his appeal to this court based on thirty-five alleged errors in law.

In order to reduce the discussion of such a bewildering mass to more reasonable limits, and some symmetry of form, we have endeavored to classify the whole under the follow-

ing five heads;—The tender of the amount of the loss; The submission to arbitration; The conduct of the arbitrators; The rulings of the court concerning the evidence; The omission to add interest to the award.

1. In regard to the tender, two questions are raised: namely, whether the allegations of the answer were sufficient, and if so, whether the proof of tender was sufficient.

The answer sets forth in substance the willingness of the defendant and the other companies to pay the full amount of the award, and that it had been repeatedly tendered by the defendant to the plaintiff, who refused to receive it. The plaintiff now claims that the tender as pleaded was not good because of the use of the words "in satisfaction," which he claims import a condition.

We do not think the words necessarily import any condition, but that they may mean simply that the full amount of the award was tendered. But it is not necessary to decide whether the pleading was technically accurate or not. It was not demurred to, as it should have been to entitle the plaintiff to the benefit of the point raised. Had there been a demurrer, we must presume that the defendant would have obviated the difficulty by amendment, for it will be observed, as we shall presently see, that the tender, as in fact made, was clearly unconditional and valid and the testimony to prove it was not objected to.

The other objection, that four other companies were included and one gross sum tendered in behalf of all, may be disposed of in a similar way. In the absence of a demurrer it ought not to be fatal, and to treat it so would be very unjust under the circumstances of this case. The plaintiff, it would seem, could not have been prejudiced in any way, for if the award was valid it would not be possible for him to recover a greater sum than his entire loss. The tender of the whole was a benefit rather than an injury, and the entire loss could not have been paid without including the defendant's *pro rata* share. The plaintiff cites *Strong* v. *Harvey*, 3 Bing., 304, as conclusively showing that such a tender must be held bad in law. The case is somewhat analogous in

that there was an association of ship-owners as individuals and not as a corporation, for the mutual insurance of each other's ships, under which each one was holden to pay only in proportion to his subscription, and one only was sued. But here the analogy fails. There had been no arbitration agreed to by all the parties concerned, consolidating all the separate liabilities into one sum of damages, and on referring to the case it will be seen that the real point there decided was simply one of variance, for BEST, C. J., in giving the opinion said: "When a man has separate demands for unequal sums against several persons, an offer of one sum for the debts of all, *will not support a plea* stating that a *certain portion of the sum offered was tendered for one of them.*" In the case at bar the form of the offer and the form of allegation as to this point precisely agree.

The other objection that the facts found did not constitute a legal tender, is effectually disposed of by the finding. To meet the objection that the offer was conditional we have the finding of the trial judge as follows :—

"I find that before the commencement of this suit, George A. Fay, attorney for the defendant, and for all the insurance companies, having been thereto duly authorized, made to the plaintiff, in behalf of said companies, an unconditional and unqualified offer to pay to him the sum of $4,900, which sum the plaintiff refused to receive. The offer was made in the office of Fay, and in the presence of Blackwell and Cowles. Fay informed the plaintiff that the insurance companies proposed to pay to him, the plaintiff, $4,900, the amount of the award, and thereupon verbally made to the plaintiff an unconditional and unqualified offer to pay to him at that time the sum of $4,900, which the plaintiff refused to receive."

And the other objection founded on the fact that the money was not actually produced within easy reach of the plaintiff's hand, is disposed of in the finding as follows:— "In making the tender Fay did not produce the money, nor did he have at his office money sufficient to pay said sum. He thereupon inquired of the plaintiff if it would make any

difference if he went and procured the money, and the plaintiff replied that it would not. Fay thereupon informed the plaintiff that he wished no misunderstanding upon the subject, that he desired to make to the plaintiff a legal tender of the sum of $4,900, and that if it would make any difference he would go to the bank and procure the bills or gold. The plaintiff replied that it would make no difference, that he would not take the bills or gold, and that he need not make a formal tender of the money, as he would not accept it. I find from these facts that the plaintiff, knowing the intention of Fay to make a legal tender to him of said sum of $4,900, expressly and intentionally waived the production of the money, intending to have Fay understand that he would consider such tender good without the production of the money, and that Fay could have produced the money, and would immediately have done so, had not the plaintiff so waived the production thereof."

2. Was the submission to arbitration valid? As already suggested most of the grounds upon which the plaintiff sought to impeach the validity of the submission have been disposed of by an adverse finding of the facts relied upon by the plaintiff. And in the reasons of appeal only two errors are assigned affecting the submission, namely, that the court erred in holding that it was properly executed, and in holding that it corresponded with the requirements of the policy.

As to the execution of the agreement of submission the court finds that "the names of the defendant company, and of all said insurance companies, and of the agents by whom the names were signed, were signed to the agreement of appraisal before the award was made, and before the same was signed by the plaintiff." Then, after a finding in detail showing by whom, by what authority, and in what mode the agreement was executed by the several companies whose names appear as signers, there follows this further finding:—"No evidence was offered to show a want of authority upon the part of any of the persons so signing for said companies. None of the companies have ever attempted to repudiate the agreement, nor have any of the companies ever

questioned the authority of the persons so signing as their respective agents. When the plaintiff signed the agreement he did not question the authority of these persons to act for the companies in signing the agreement. The result of the appraisal was reported to each of the companies, and all the companies have, at all times, considered themselves bound by the terms of the agreement. There was offered no evidence of any written authority to the agents, nor of any other facts than as stated in this finding, showing any authority to the agents to sign for the companies."

If then it were possible for legal acumen to discover a flaw in the previous authority of any agent to sign the name of his company or in the mode of execution, it is very clear that the subsequent adoption of the submission by all the companies renders it valid and binding. Ang. & Ames on Corporations, § 240; 3 Kent's Com., 4th ed., 260; *Johnson* v. *Smith*, 21 Conn., 627; *White* v. *Fox*, 29 id., 570; *Cady* v. *Shepherd*, 11 Pick., 400.

But the counsel for the plaintiff invoke a principle of law which, if correct, would exclude the application of the doctrine of ratification to the facts of this case. They say in their brief—" This award cannot be binding upon the plaintiff unless the circumstances are such that all the other parties to it would have been legally bound if the amount had exceeded their expectations. Any ratification or acceptance, or considering themselves bound, after the award was made, can have no effect."

No authority whatever was cited in support of this broad proposition, and we think that nearly all the cases on this subject will show that the effect of ratification must be to disturb some previous rights in the other parties, and that there is and must necessarily be the option of holding back a reasonable time to determine whether ratification would be advantageous; but ratification when effected has relation back to the time of the original transaction. We ought to add that there is nothing at all in this case to show that the insurance companies were playing a game of fast and loose, holding back their approval so as to speculate on the chances

of the result. The finding is directly opposed to such an imputation. Not only did they approve when they heard of the award, but "at all times they considered themselves bound by the terms of the agreement."

That the claim of the plaintiff is not good law we think is demonstrated by the reasoning of Judge STORY in his treatise on Agency, § 248, where it is said: "As from what has been said the principal thus acquires a right to elect whether he will adopt the unauthorized act or not, it must be admitted, that the parties do not generally stand upon equal terms; since the principal may always elect to ratify the act, if it is for his benefit, and to disavow it, if it is to his injury. But this consequence has never been allowed to overcome the force of the general doctrine. Thus, for example, where an unauthorized agent procured an insurance to be made on a certain ship for the benefit of the owner thereof, and the ship was lost during the voyage, and long after the loss the owner ratified the insurance, and a suit was brought against the underwriters, it was held to be no objection to the recovery that the ratification was not until long after the loss and that the owner would not have been bound to pay the premium if the ship had safely arrived." *Hagedorn* v. *Oliverson*, 2 Maule & Selw., 485; *Routh* v. *Thompson*, 13 East, 274; 1 Livermore's Principal & Agent, 44.

The other ground upon which it is attempted to impeach the validity of the award as matter of law, is that the submission as executed did not correspond with the requirements of the policy. There are several independent answers to this claim, besides the objection that the question was not made in the court below, as it ought to have been.

The provision in the policy referred to was not designed to prescribe and it does not pretend to prescribe any form of submission. It only gives certain leading features of the submission, which were in fact substantially complied with. We find in both the same restricted subject-matter, namely the appraisal of the loss or damage; the same standard of appraisal, the cash value: the same number of arbitrators, with provision for an umpire, and we find that the same

mode of selection that the policy prescribed was in fact adopted. But a detailed comparison of the similarity of the features becomes useless in view of the further consideration that the capacity of the parties to contract could not be restricted by the policy, so that they could not waive its requirements and make a submission to suit themselves, provided of course it was not otherwise unlawful. If one of the parties was seeking to enforce against the other an executory provision respecting a submission to arbitration, then the terms of that agreement must be respected, but an actual voluntary submission stands on entirely different ground.

If parties make an arbitration agreement which has the effect to oust the courts of jurisdiction, it is held to be invalid, (although more recent decisions question whether this doctrine is sound in principle,) but it has always been held, both by the courts of England and of the United States, that arbitrations to settle particular questions which are auxiliary to the jurisdiction of courts, such as the amount of damages, or the amount of the loss by fire under policies of insurance, are binding in law, and indeed highly favored by courts.

3. We come now to the questions relative to the conduct of the arbitrators. A somewhat startling arraignment of their conduct is set forth in the reasons of appeal from the 11th to the 19th inclusive, in substance as follows:—that they refused to hear the plaintiff's evidence, that they made their award without first notifying the plaintiff that they were about to close their examination, and thereby cut off his opportunity to introduce evidence; that Mead, one of the arbitrators, was paid by the insurance companies and the other by no one; that Mead took testimony not under oath in the absence of the plaintiff and of the other arbitrator, Morehouse; that the time occupied by the arbitrators was too short and their method unfair; that the whole value of the property and the whole loss should have been considered; that the value of what remained of the building as it stood, should have been ascertained, and that the season of

the year and the length of time which must elapse before the building could have been rebuilt, should have been considered.

These objections are either insufficient in law or are directly met and disposed of as questions of fact under the finding.

The finding is as follows:—" The appraisers, Mead and Morehouse, were selected, as was known both by the plaintiff and by the appraisers, the former by the insurance companies, and the latter by the plaintiff, as expert and experienced appraisers of such losses and damages. Both were builders of large experience, and possessed of extensive knowledge of the cost of such labor and materials as entered into the construction of the building in question, and were in all respects competent and proper persons to act as such appraisers. Mead had often been selected as an appraiser for insurance companies and in such cases was paid by them. In the present case he was paid the sum of $40, each of the companies paying its proportionate part as was expected by Mead. I find said sum to be no more than a reasonable compensation for his services, and no more than he was accustomed to receive from others for such work. As was known to the plaintiff, Morehouse expected to be paid by the plaintiff.

" While at Wallingford, before making their award, Mead, for the purpose of learning the fact, inquired of two persons known to him to be joiners, the rate of wages paid joiners at Wallingford and received their replies. It did not appear but that their answers were true, nor did it appear that the plaintiff was in any manner prejudiced thereby or that the decision of the arbitrators was affected thereby.

" The appraisal in question was made by Mead and Morehouse during the afternoon of February 26th, 1885. After having been sworn they proceeded to the building and made a careful examination thereof, and estimate of the damage thereto, occupying about one hour and a half in making their examination and measurements. The plaintiff accompanied the appraisers during the examination, described to

them the rooms, informed them regarding the construction of the building, was freely inquired of by the appraisers respecting matters involved in their examination, and was permitted to give all the information which he offered to give.

"Before the making of their award the appraisers denied the plaintiff no opportunity to appear before them and give any information or evidence respecting the subject of the appraisal, nor did they refuse or fail to consider any information or evidence presented to them by the plaintiff. The plaintiff did not state to them the amount of his insurance, nor the amount of the loss as claimed by him, nor the cost of his building. After the examination had been completed, the plaintiff procured for the appraisers a room in which to make their computations.

"I find that the appraisers throughout the entire proceedings discharged their duties intelligently and fairly, that in fixing the amount awarded they considered all the information gained by their examination of the premises and imparted by the plaintiff, that the amount so awarded represents their best judgment of the extent of the damage, and that in no respect did they fail to perform their duties in accordance with the requirements of the provisions of the agreement of appraisal or in accordance with the language of the award of appraisers set forth in the instrument.

"Before notice to the plaintiff of the award, he made no request of the appraisers for a hearing of any kind, nor gave them any notice that he expected or desired to be heard in any other manner or with any other evidence than he had been heard by the appraisers. Before notice of the award he made no complaint or objection concerning the manner in which the examination was made by the appraisers, nor concerning any of the doings of the appraisers. After notice of the amount of the award, he claimed to them that he should have been heard with his books and vouchers, showing the cost of the building, and demanded such hearing, which was refused by the appraisers. Except as herein appears, the appraisers gave to none of the parties in interest

any notice of the time when they would complete their proceedings or announce their award."

This finding will leave no doubt in regard to the legality of the proceedings on the part of the arbitrators, especially if we bear in mind the legal principles that are applicable, a few of which we will notice.

In the first place, arbitrators are not forced to follow strict rules of law, unless it be a condition of the submission that they shall do so. See *Remelee* v. *Hall*, 31 Verm., 583, and the cases cited under the next proposition.

If arbitrators have acted in good faith neither party will be permitted to avoid the award by showing that they erred in judgment, either respecting the facts, or respecting the law where the submission does not require them to follow the law. 6 Wait's Actions & Defenses, 553 ; *Merritt* v. *Merritt*, 11 Ill., 565; *Moore* v. *Barnett*, 17 Ind., 349; *Fudickar* v. *Guardian Life Ins. Co.*, 62 N. York, 392; *Boston Water Power Co.* v. *Gray*, 6 Met., 131.

Again, if, as is directly found in this case, persons are selected arbitrators by reason of special knowledge or skill possessed by them with reference to the matter in controversy, so that it is apparent that the parties intended to rely upon their personal information, investigation and judgment, they may even be justified in refusing altogether to hear evidence. Morse on Arbitration & Award, 143 ; *Wiberly* v. *Matthews*, 91 N. York, 648; *Eads* v. *Williams*, 24 L. Jour., Ch., 531; *Caledonia Railway Co.* v. *Lockhart*, 3 Macq., 808; *Johnstone* v. *Cheape*, 5 Dow, 247.

The inquiry made by Mead, for his own information, as to the prices paid for labor in Wallingford, in the absence of the parties and of the other arbitrator, will not be sufficient to set aside the award, unless it appears (and it does not in this case), that the plaintiff was prejudiced or that the decision was affected thereby. Morse on Arbitration & Award, 127, 167 ; *Straw* v. *Truesdale*, 59 N. Hamp., 109 ; *Adams* v. *Bushey*, 60 id., 290.

4. In regard to the rulings of the court relative to the admission of evidence, upon which some fourteen of the

assigned errors are predicated, we do not think there was any error for which a new trial ought to be granted. There is scarcely a question that has any practical importance, either as establishing or illustrating any rule of evidence, unless perhaps those questions which refer to the methods of an arbitrator in reaching his conclusions, which, upon well established principles, are not proper subjects of inquiry. And as there is to be no re-trial of this case it seems wholly unnecessary to occupy the time and space required for the statement and discussion of so many questions of no general utility whatever.

5. The question as to interest on the award we dismiss upon the ground that no claim was made in the court below relative to interest, and there was no proof of any agreement or custom in regard to it.

There was no error in the judgment complained of.

In this opinion the other judges concurred.