### LONDON & LANCASHIRE FIRE INS. CO. v. STORRS.[1]

(Circuit Court of Appeals, Eighth Circuit.    December 2, 1895.)

#### No. 631.

**1. INSURANCE—APPRAISEMENT OF LOSS.**

An appraisement of the amount of the loss, made by persons appointed by the insurer and the insured, is binding, though the proceedings leading up to the appointment and appraisement are not in strict accordance with the requirements of the policy, since the parties are at liberty to waive such requirements, and make any lawful submission satisfactory to themselves.

**2. SAME—INSTRUCTION—HARMLESS ERROR.**

When the pleadings, in an action on an insurance policy, are such as not to allow the jury to find that the value of the property destroyed was greater than that fixed by appraisers, defendant cannot complain because the court went outside the issues by charging that, if the appraisement did not show the value of the property, the jury might ascertain its value from the evidence; the jury, in effect, upholding the appraisement.

[1] Rehearing denied January 20, 1896.

In Error to the Circuit Court of the United States for the District of Colorado.

This action was brought in the United States circuit court for the district of Colorado by Alfred Storrs, the defendant in error, against the London & Lancashire Fire Insurance Company, the plaintiff in error, to recover the sum of $4,000 on a policy of fire insurance issued by the plaintiff in error to the defendant in error on his dwelling house and barn, which were destroyed by fire on the 5th day of November, 1893. The complaint alleges that the value of the property insured and burned was more than the total amount of insurance thereon. As respects the value of the property burned, the complaint counts exclusively on an appraisement thereof, touching which it contains this averment: "And plaintiff further alleges that, after the said fire, there was a disagreement between plaintiff and defendant as to the amount of the loss occasioned thereby, and the question as to the amount of such loss was thereupon, by agreement between the plaintiff and defendant, and in accordance with the provisions of the said policy of insurance, duly referred for ascertainment to two competent disinterested appraisers, one of whom was selected by the plaintiff, and one by the defendant; that said appraisers thereafter estimated and appraised the loss of the plaintiff by said fire, and made an award to plaintiff, in the words and figures as follows, to wit:

"'Denver, Colo., Dec. 20th, 1893.

"'We, the undersigned builders, agree on the A. Storrs buildings at the following values at the time of loss by fire, Nov. 5th, 1893:

| | | |
|---|---:|---:|
| New barn and fix | | $ 7,154 00 |
| Old barn and fix | | 750 00 |
| Dwelling | | 4,059 75 |
| Bank and cook house | | 846 50 |
| Bull pen | 3550 | |
| Hog house | 723 | |
| Ice house and fence | 600 | |
| | | 1,873 00 |
| | | $14,683 25 |

"'Thomas C. Rundle.
"'Thomas Freeman.'"

The answer denied these allegations of the complaint. Touching the appraisement, the answer states that "plaintiff admits that, after the alleged fire, there was a disagreement between the plaintiff and defendant as to the amount of the loss occasioned by said fire; but defendant denies that the question as to the amount of such loss was thereupon, or at any time, by agreement between the plaintiff and defendant, or otherwise, or in accordance with the provisions of said policy of insurance, or at all, referred for ascertainment to two competent disinterested appraisers, or to any appraisers, either selected by the plaintiff and defendant, or at all. Defendant denies that the said pretended appraisers estimated and appraised the loss of the plaintiff, by said fire, and denies that the said pretended appraisers made an award to plaintiff in the words and figures set out in the complaint, and denies that said pretended appraisers, or any appraisers, made any award to the plaintiff, in any manner or form, or at all." The following are the provisions of the policy relating to appraisement: "This company shall not be liable beyond the actual cash value of the property at the time any loss or damage occurs, and the loss or damage shall be ascertained or estimated according to such actual cash value, with proper deduction for depreciation, however caused, and shall in no event exceed what it would then cost the insured to repair or replace the same with material of like kind and quality. Said ascertainment or estimate shall be made by the insured and this company, or, if they differ, then by appraisers, as hereinafter provided. * * * In the event of disagreement as to the amount of loss, the same shall, as above provided, be ascertained by two competent and disinterested appraisers,—the insured and this company each selecting one,—and the two so chosen shall first select a competent and disinterested umpire. The ap-

praisers together shall then estimate and appraise the loss, stating separately sound value and damage; and, failing to agree, shall submit their differences to the umpire, and the award in writing of any two shall determine the amount of such loss. The parties thereto shall pay the appraiser respectively selected by them, and shall bear equally the expenses of the appraisal and umpire." The answer set up numerous affirmative defenses, based on alleged noncompliance of the insured with the conditions of the policy, but, in the view the court take of the case, these conditions were waived, and need not be set out or further considered. There was insurance on the property in other companies, but, after the appraisement, these companies settled their losses. There was a trial to a jury, and a verdict and judgment in favor of the plaintiff, and the defendant sued out this writ of error.

Sylvester G. Williams, for plaintiff in error.

Henry T. Rogers, Lucius M. Cuthbert, and Daniel B. Ellis, filed brief for defendant in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

CALDWELL, Circuit Judge, after stating the case as above, delivered the opinion of the court.

We agree with the statement in the brief of the learned counsel for the plaintiff in error that, "as to the essential facts, there is substantial harmony among the witnesses, on both sides." These essential facts are that the house and barn of the defendant in error were insured against loss by fire by the plaintiff in error, the London & Lancashire Fire Insurance Company, and in some other companies also; that the property was burned; that the insured gave immediate notice of the loss to Mr. Sweeney, the agent of all the companies having policies on the property, and to Mr. Heltzell, the adjuster for the defendant company; that the agents and adjuster visited the premises, and employed Mr. Freeman, a mechanic and builder who had erected the buildings for the insured, to give them an estimate of their value, which he did; that, after getting Mr. Freeman's estimate, but without communicating to the insured that they had procured such an estimate, the agent requested the insured to select some one to act for him in conjunction with Mr. Freeman in appraising the property; that the insured thereupon selected Mr. Rundle for that purpose; that Mr. Freeman and Mr. Rundle, both of whom were familiar with the property, met for the purpose of determining its value; that the agents and adjuster of the insurance companies appeared before them, and the insured was there a part of the time "to answer questions," but left before they had agreed upon the value; that, after discussion and mutual concessions, the appraisers finally agreed upon the value of the property, and signed the appraisement appearing in the statement of the case.

The material clause of the paper, and that which gives it the indelible stamp of an appraisement of the value of the property at the date it was burned, was written for the appraisers by Heltzell, the defendant's adjuster. The use of the word "builders," instead of "appraisers," has no significance. It is the office they performed that determines the character in which they acted, and the term "builders" was doubtless used to show their qualifications and fit-

ness to act as appraisers in the premises. The appraisement is plain and unambiguous. It states in explicit terms the one fact essential to the adjustment of the loss. By the terms of the policy the company is obligated to pay "the actual cash value of the property at the time any loss or damage occurs." It was to ascertain this value that each party selected an appraiser. It was this value the appraisers met to consider, and to agree upon, if they could. They did agree, and that there should be no mistake as to what they had agreed about, they state plainly that the values agreed upon are "the values at the time of the loss by fire." This language excludes the idea that any element necessary to be taken into the account to fix the exact amount of the company's liability had been omitted. It shows that no other or further appraisement or conference or agreement of the parties was contemplated or necessary. If the paper in question is neither an appraisement nor an ascertainment of the loss by the parties through their respective agents selected for that purpose, then it is mere waste paper. The court is asked to declare that the selection by each party of an appraiser, the meeting together of these appraisers for the purpose of ascertaining the value of the property, their consideration of and final agreement upon its value, and the making and signing of their appraisement, was a mere farce, leading to no end, and intended by the parties to be fruitless of results from the beginning. It is inconceivable that rational and intelligent men would do such a vain thing.

The question to be settled was the value of the buildings at the time they were burned. Many elements necessarily entered into the determination of this question,—among them, the age of the buildings, and the depreciation of value resulting therefrom; the materials out of which they were constructed, and their mode of construction and finish. These are elements which the appraisers could not fail to take into consideration. It is idle for the insurance company to say that it did not intend to submit to the appraisers the consideration of one of these elements, viz. the depreciation in value of the buildings from age. No such qualification of the submission was ever intimated to the insured, and it is flatly inconsistent with the terms of the appraisement itself. If the insurance company did not contemplate an appraisement that would put an end to the controversy, this purpose was carefully concealed from the insured, and the secret purpose of its adjuster, Heltzell, if it was entertained to make such a contention later, can avail the company nothing. That would be a fraud which the law would not sanction, and from which the company could reap no advantage. There was talk between the insurance agents and adjusters themselves, in the absence of the insured, as to the best policy to be pursued by them in reference to this loss. Mr. Sweeney, agent in chief for all the companies, and having authority over all, is dead, but his position in the conference between the insurance agents and adjusters may be gathered from the testimony of Miss Higginson, one of his partners in the insurance agency business. She testifies as follows:

"Q. Were you present at any time, Miss Higginson, when the propriety of acting on the figures of the builders, and accepting them as the final figures, was discussed? A. Yes. Mr. Sweeney and Mr. Heltzell discussed it, I think, one afternoon in my presence, and Mr. Heltzell wanted to appraise, and not wait for the figures of Mr. Rundle or Mr. Freeman, and Mr. Sweeney thought that he ought to wait for the figures of Mr. Rundle and Mr. Freeman, and he said that they would wait until they got the figures. If they were not satisfactory, and if they could not be brought together, why then they would enter into a formal appraisal. Q. Who said that? A. Mr. Sweeney. Q. State what, if any, answer Mr. Heltzell made to that. A. I don't think Mr. Heltzell replied. Q. That was prior to the time of making this award? A. Yes; before they got their figures."

Mr. Freeman and Mr. Rundle were "brought together," and the necessity for what Mr. Sweeney called a "formal" appraisement was averted. The appraisers got together, and left no basis for a disagreement, except by throwing overboard their appraisement. It is obvious that it was Mr. Sweeney's idea, when talking to the other agents and adjusters, that if Mr. Freeman and Mr. Rundle agreed upon the value of the property at the time of the loss, that would terminate the whole controversy, and he certainly gave the insured to understand that such would be the case. It is absolutely certain that this was the understanding of the insured, who had never heard that there was any such thing as a "formal appraisement," as distinguished from an appraisement. The agent of the defendant company knew that this was the insured's understanding when he invited him to select his appraiser. The insured derived this understanding, not alone from what the insurance agent told him, but, as well, from the proceeding itself, which, to the mind of a reasonable man, could import nothing else. It is not improbable that Heltzell, the adjuster of the defendant company, labored under the impression that if he was not satisfied with the appraisement that Mr. Freeman and Mr. Rundle might agree upon, he could repudiate it, because the reference to the appraisers did not conform in all respects to the plan of reference outlined in the policy; in other words, it was not "formal." And it is the contention of the counsel for the plaintiff in error that a binding and obligatory appraisement under the terms of the policy can only be made when the proceedings leading up to it are conducted in strict accordance with the requirements of the policy relating thereto.

We may observe that no effort is made to impeach the appraisement, either for fraud, mistake, or misbehavior of the appraisers, or upon any ground whatever. The contention of the plaintiff in error is that there was no appraisement. This contention is founded upon the assumption that there could be no valid appraisement which did not correspond in every particular with the requirements of the policy. In the brief of the counsel for the plaintiff in error it is said: "The issue was whether or not the amount of the loss had been ascertained as the policy provided." And it is pointed out that the appraisement falls short of the requirements of the policy, because the parties did not first "proceed to ascertain and estimate the loss between themselves," which it is claimed is an indispensable prerequisite to any valid appraisement, and that the appraisers did not select an umpire before making their appraisement, as re-

quired by the terms of the policy. But it was perfectly competent for the parties to waive or vary any or all of the conditions of the policy as to the time and mode of appraisal. It was open to them, without any previous disagreement over the question of the value of the property, and without having conferred together at all on that subject, to refer that question to appraisers, as was done, and it was competent for the appraisers to proceed, as they did, with the express or implied assent of the parties, without first appointing an umpire.

In Insurance Co. v. Norwood, 16 C. C. A. 136, 69 Fed. 71, we had occasion to consider the power of the insurer and the insured to vary or waive written stipulations of the policy, and we there said that:

"A contract of insurance is not within the statute of frauds, and may be by parol. Commercial Ins. Co. v. Union Mut. Ins. Co., 19 How. 318; Insurance Co. v. Shaw, 94 U. S. 574; Henning v. Insurance Co., 2 Dill. 26, Fed. Cas. No. 6,366. And, if it can be made by parol, it may be varied by parol. Parties to contracts cannot disable themselves from making any contract allowed by law in any mode the law allows contracts to be made. A written contract may be changed by parol, and a parol one changed by a writing, despite any provision in the contract to the contrary. 'A written bargain is of no higher legal degree than a parol one. Either may vary or discharge the other, and there can be no more force in an agreement in writing not to agree by parol than in a parol agreement not to agree in writing. Every such agreement is ended by the new one which contradicts it. Insurance Co. v. Earle, 33 Mich. 153. See, to the same effect, Insurance Co. v. McCrea, 8 Lea, 513; Insurance Co. v. Norton, 96 U. S. 234; Pechner v. Insurance Co., 65 N. Y. 195; Insurance Co. v. Wilkinson, 13 Wall. 222.' "

See Hall v. Insurance Co., 57 Conn. 105, 17 Atl. 356.

In Bangor Sav. Bank v. Niagara Fire Ins. Co., 85 Me. 68, 26 Atl. 991, the court said:

"On the other hand, it is obviously competent for the parties to modify or waive any provision of their written contract by a subsequent mutual agreement not in writing. Wiggin v. Goodwin, 63 Me. 392; Goss v. Nugent, 5 Barn. & Adol. 65; Hall v. Insurance Co., 57 Conn. 105, 17 Atl. 356."

In construing provisions in a policy relating to appraisement, identical with those in the policy in suit, the supreme court of Connecticut said:

"The other ground upon which it is attempted to impeach the validity of the award as matter of law is that the submission, as executed, did not correspond with the requirements of the policy. * * * The provision in the policy referred to was not designed to prescribe, and it does not pretend to prescribe, any form of submission. It only gives certain leading features of the submission, which were in fact substantially complied with. * * * But a detailed comparison of the similarity of the features becomes useless, in view of the further consideration that the capacity of the parties to contract could not be restricted by the policy, so that they could not waive its requirements, and make a submission to suit themselves, provided, of course, it was not otherwise unlawful. If one of the parties was seeking to enforce against the other an executory provision respecting a submission to arbitration, then the terms of that agreement must be respected; but an actual voluntary submission stands on entirely different grounds. * * * It has always been held, both by the courts of England and of the United States, that arbitrations to settle particular questions which are auxiliary to the jurisdiction of courts, such as the amount of damages, or the amount of loss

by fire under policies of insurance, are binding in law, and, indeed, highly favored by the courts." Hall v. Insurance Co., 57 Conn. 105, 17 Atl. 356.

The doctrine of this case is approved by the supreme court of Maine in Bangor Sav. Bank v. Niagara Fire Ins. Co., supra.

Counsel for the plaintiff in error cite us to the case of Boyle v. Insurance Co. (Pa. Sup.) 32 Atl. 553. That case is in entire harmony with the views here expressed. The policy in that case is identical with the one here in suit. One of the questions in that case was whether the action was prematurely brought in view of the arbitration clause in the policy. The insurance company, being dissatisfied with the proofs of loss, demanded the appointment of appraisers without first making an effort to agree with the insured upon the amount of their loss, and thereupon the insured brought their action. The court held that the arbitration clause of the policy "contemplates an actual effort to agree" by the parties themselves, and that the insurer could not demand the appointment of appraisers until it had made an effort to agree with the insured upon the amount of the loss, and that, having demanded an appraisement without first making such effort, the insured had a right to bring their action on the policy. The court said: "Neither can insist on the second, who has not shown himself ready and willing to enter upon the first, because these remedies are not optional to either. They are successive, unless both agree to the contrary." It will be observed that the court say the successive steps leading up to the appraisement provided for by the policy are obligatory on the parties "unless both agree to the contrary."[1] In this case the action of the insurer and the insured in appointing appraisers before making any effort to agree between themselves on the amount of the loss was a waiver of the first requirement of the arbitration clause of the policy, and the court below should have so told the jury. And it should have further told them that the appraisement fixed the value of the property at the time it was burned, and that their verdict should be arrived at upon that basis. The court did not do this, but told the jury that the parties had "chosen to rely,—the plaintiff upon this paper, as stating the real value of the premises at the time they were destroyed; and the defendant insisting, apparently, that he is not bound to pay until there shall be some formal appraisement according to the terms of this policy." This was a correct statement of the issue between the parties, but it was not followed up, as it should have been, by a statement that the appraisement, upon the evidence, was binding on the parties. Whether there was or was not a valid appraisement was the only contested issue at the trial, and, upon the undisputed evidence, that was clearly one of law for the court. If the appraisement was binding on the parties, the insured was entitled to recover; otherwise not, for the reason that his action, so far as

---

[1] Construing this same arbitration clause, the court in Insurance Co. v. Alvord, 21 U. S. App. 228, 9 C. C. A. 623, 61 Fed. 752, held that it was "a collateral and independent agreement, a breach of which, while it will support a separate action, cannot be pleaded in bar to an action on the principal contract."

related to the value of the property, was grounded solely upon the appraisement. No evidence as to the value of the property other than the appraisement was introduced by either party, or could have been, under the issue made by the pleadings. But the court told the jury that, if the appraisement did not show the value of the property, they should ascertain its value from the evidence. Under the issue in the case this was undoubtedly an error, but it was an error in favor of the defendant, and of which it cannot complain. Under the charge the jury were at liberty to find the value of the property was less than that fixed by the appraisers, but, under the pleadings, they could not find that it was greater, and they did find that it was of the value fixed by the appraisers; or, in other words, they upheld the appraisement.

In Boyle v. Insurance Co. (Pa. Sup.) 32 Atl. 553, the court say:

"The contract contains the undertaking of the company to insure the general stock of merchandise of John D. Boyle's Sons 'against all direct loss or damage by fire' to the extent of $2,500, in consideration of the payment of a cash premium of $25. Arranged around this contract is a line of defensive 'stipulations, exceptions, conditions, and provisions.' Some of these are not numbered, but, with others, numbered from 1 to 112, inclusive, they stand bristling like armed sentinels around the contract, and the liability of the company thereunder, ready to impale even an honest claimant on a bare technicality."

The answer in this case alleges that the insured failed to comply with a number of these stipulations and conditions, touching which it is only necessary to say that they were of such a character that they were waived when the parties left the ascertainment of the loss to the appraisers. "By joining in the proceedings to fix the amount of the loss, the company manifested its intention to dispense with preliminary formalities. The assured had a right to rely upon this manifestation of intention." Carroll v. Insurance Co., 72 Cal. 297, 13 Pac. 863.

The judgment of the circuit court is affirmed.