KEACHIE and another, Respondents, vs. STARKWEATHER DRAINAGE DISTRICT, Appellant.

*November 8, 1918—January 7, 1919.*

*Drainage: Contracts: Validity: Making decision of commissioners final: Acceptance of ditches on completion: Waiver of requirements in specifications: Duty of contractor: Inspection of work: Intermediate payments: Statements as to satisfactory performance: Estoppel: Failure to complete work on time: Penalty or liquidated damages.*

1. In a contract with a drainage district for the excavation of certain ditches a provision that "in the interpretation of these specifications and the contract and upon all questions concerning the execution of the work the decision of the [drainage] commissioners shall be final," is valid and confers upon the commissioners the same powers as are conferred upon architects by similar provisions in building contracts.

2. Findings by the commissioners in such case, after completed performance is claimed, as to the amount of excavation still necessary and as to other delinquencies on the part of the contractors, are final, binding, and conclusive unless impeached for fraud or for mistake so gross as to amount to constructive fraud.

3. The vesting in one of the parties to an executory contract of the power to decide finally all questions that may arise as to the contract, specifications, or execution of the work is not condemned by public policy any more than is a contract which is to be performed to the full satisfaction of one of the parties. In either case there must be the exercise of honest judg-

ment, and the party performing the contract cannot be denied the fruits thereof by fraudulent, arbitrary, or capricious action on the part of the other.

4. When the parties to an executory contract stand upon an equal footing and intelligently and deliberately provide therein for an amicable adjustment of any difference that may arise, either by arbitration or otherwise, the contract should stand and the parties be made to abide by it and by the judgment of the tribunal of their choice; and the question whether it was a wise or provident contract is not material.

5. A provision in a drainage contract that "no ditch or lateral shall be finally accepted until completed for its entire length, and . . . the contractor shall keep such ditch or lateral in good condition or repair at his own expense until it is finally accepted by the commissioners," did not require the commissioners to accept each ditch or lateral upon its completion, such an intent not being shown by any other provision in the contract and being negatived by the conduct of the parties.

6. Where a contract required that drainage ditches be dug to a one-to-one slope on the sides, the fact that the contractors, who found it necessary to use a floating dredge, explained to the commissioners that with such dredge the ditches could not be dug to the required slope but that by digging them wider and deeper than the contract called for the sides would in time cave in and thereby give the proper slope, and the fact that the commissioners permitted him to proceed in that way, did not show a modification of the contract or a waiver of the requirement of a one-to-one slope.

7. Where one contracts to do a certain thing in a certain manner and in accordance with certain specifications it is his duty to make his work comply with the contract and specifications unless, by a provision for inspection or otherwise, he is relieved from that duty by the terms of the contract itself.

8. Under a drainage contract intermediate payments were to be made each month, based upon approximate estimates of work performed during the preceding month. Such payments were to be a certain percentage of the contract price "for the work that shall be completed to the satisfaction of the commissioners." The contract did not provide for inspection of the work, and in practice the estimates were approximated by ascertaining the distance dug during the month, without any attempt to measure accurately the other dimensions of the ditches. Such measurements were in fact impracticable, owing to the manner in which the digging was done. *Held,* that by making the intermediate payments the commissioners did not waive their right to object that the work was not done

according to the plans and specifications, even though they had from time to time called the contractors' attention to certain irregularities in the work which were manifest upon casual observation. *Ashland L., S. & C. Co. v. Shores,* 105 Wis. 122, distinguished.

9. Neither a statement, in an annual report by the commissioners to the circuit court, that work according to the plans was progressing in a satisfactory manner except as to the rapidity with which it was being done, nor a stipulation, made by all parties upon a renewal of the contractors' bond, to the effect that up to that time the contract had been satisfactorily performed in accordance with its terms, except as to the time for completion, operated as a waiver or an estoppel with respect to the right of the commissioners to assert that work theretofore done was not in accordance with the plans and specifications, there being no evidence that the contractors knew of said report or were in any manner influenced by it, or that the stipulation in any way affected their subsequent conduct, and it affirmatively appearing that they did not construe either document as an expression of the commissioners' satisfaction with the work already completed or as indicating an acceptance thereof.

10. Provisions in a drainage contract that for so much of certain specified quantities of the excavation as should not be completed at specified dates the contractors should in each case forfeit "as liquidated damages" a percentage (varying from ten to twenty per cent.) of the contract price for the performance of the excavation so remaining uncompleted in each particular instance at the date specified, are construed as calling not for penalties but for liquidated damages, there being nothing to indicate that the parties did not so intend and the situation being such that a computation of actual damages would be extremely difficult.

ESCHWEILER and VINJE, JJ., dissent in part.

APPEAL from a judgment of the circuit court for Dane county: CHESTER A. FOWLER, Judge. *Reversed.*

The defendant is a drainage corporation, comprehending certain territory in Dane county, Wisconsin, contiguous to the city of Madison. On or about the 16th day of November, 1911, the plaintiffs entered into a contract with the said drainage district to dig a system of drainage ditches, consisting of two main ditches and various laterals. The main

ditches were known as the East main and the West main. By the terms of the contract the work was to be completed by the 1st day of January, 1913. The work was not completed by that time, and on the 3d day of February, 1913, a new contract was entered into by the terms of which the work was to be completed January 1, 1914. The work was to be done for a unit price per cubic yard for earth and material removed. The purpose of the new contract was to extend the time within which the work was to be completed. Its terms were identical with those of the first contract, except that in the second contract occur these provisions:

"It is further understood and agreed that said parties of the second part shall have completed the excavation of not less than 75,000 yards of the material now remaining unexcavated under said contract on or before July 1, 1913, and that for so much of said 75,000 yards as such remain unexcavated on July 1, 1913, the said parties of the second part shall forfeit as liquidated damages ten per cent. of the contract price for the performance of said excavation so remaining uncompleted. And that they shall fully complete the excavation of 150,000 yards of the materials now remaining unexcavated by the 1st day of October, 1913, and that for so much of said 150,000 yards as shall remain unexcavated on October 1, 1913, the said parties of the second part shall forfeit as liquidated damages an amount equal to fifteen per cent. of the contract price for the performance of said excavation so remaining uncompleted.

"In case said contract and all work should be performed and labor and material to be furnished thereunder, shall not be completed or done by January 1, 1914, then for all work remaining uncompleted on January 1, 1914, the said contractors shall forfeit as liquidated damages, not as a penalty, to said commissioners, an amount equal to twenty per cent. of the estimate cost of that portion of the work then remaining uncompleted."

By the terms of both contracts the ditches were to be dug to a one-to-one slope on the sides. It transpired that a floating dredge was necessary to dig a considerable proportion of the ditches. The contractors claimed that it was impos-

sible to give the sides of the ditches a one-to-one slope with a floating dredge. They explained this to the commissioners and said that the best they could do was to dig the ditches wider and deeper than called for in the contract, assuring the commissioners that in course of time the sides of the ditches would cave in from natural causes and thereby give the ditches the slope required. The ditches were so dug.

The contract or specifications contained the following provision: "In the interpretation of these specifications and the contract and upon all questions concerning the execution of the work the decision of the commissioners shall be final."

The contractors claimed to have completed the work on or about July 15, 1915, and that pursuant to the contract price ·for the yardage removed they had earned under their contract $28,345.59, of which sum $20,665.81 had been paid, leaving a balance due and owing the contractors of $7,679.75. They also claimed compensation for additional items, bringing their total claim to $8,110.83.

The defendant claimed that the plaintiffs had not completed their contract. The commissioners found that there was still 38,480 cubic yards necessary to be excavated to make the ditches conform to the contract, refused to pay the plaintiffs the amount demanded by them, and this action was begun. Defendant counterclaimed for damages resulting from the alleged failure of plaintiffs to complete the contract and for $2,163.04 liquidated damages for failure to complete on time.

The trial court held that the provision of the contract that "In the interpretation of these specifications and the contract and upon all questions concerning the execution of the work the decision of the commissioners shall be final" was void and of no effect; that the ditches had been excavated in a manner to comply with the terms of the contract, except 10,000 yards which remained unexcavated in the West main. It was also found that certain dirt on the edges of the ditches remained to be removed. A deduction of $1,800 from the

claim of the plaintiffs was allowed for excavation of the yardage and $75 for the removal of the dirt. The provision in the contract providing for forfeitures in case the work was not completed on time was construed to be a penalty, and $1,000 was allowed and deducted from the claim of the plaintiffs. Other small items in controversy were passed upon by the court, some of which were allowed, and judgment was rendered in favor of the plaintiffs and against the defendant for $4,646.80, with interest from July 1, 1915, and costs. From the judgment so entered the defendant appealed.

For the appellant there were briefs by *Buell & Lucas* of Madison, and oral argument by *Frank W. Lucas.*

For the respondents there was a brief by *Hill & Spohn* of Madison, and oral argument by *W. H. Spohn.*

OWEN, J. The question of ranking importance is whether the court erred in reading out of the contract the provision that "In the interpretation of these specifications and the contract and upon all questions concerning the execution of the work the decision of the commissioners shall be final." Whether this provision of the contract is valid should be met at once, because of its commanding influence on the rights of the parties hereto.

This provision differs from the ordinary provision of like tenor found in nearly every building or construction contract only in the personnel of the arbitrators or umpires appointed to decide upon the contract, specifications, and work. If the word "architect" be substituted for the word "commissioners," we will have here a provision that is usual and customary in construction contracts. The effect of a provision of this kind is not doubtful. It is well settled in the law. It is not void because it ousts the court of jurisdiction, as earnestly contended by respondents. This court, in *Hudson v. McCartney,* 33 Wis. 331, gave full scope and effect to a provision of this nature in no uncertain terms, and the

language of that case has since frequently met with approval. *Oakwood Retreat Asso. v. Rathborne,* 65 Wis. 177, 26 N. W. 742; *Bentley v. Davidson,* 74 Wis. 420, 43 N. W. 139; *Wendt v. Vogel,* 87 Wis. 462, 58 N. W. 764; *Chapman v. Rockford Ins. Co.* 89 Wis. 572, 62 N. W. 422. It is firmly established that, where matters are thus left to the decision of an architect, his decision is final unless impeached for fraud, accident, or mistake; and "the mistake here referred to is not a mere error in judgment as to the quality of the work or the responsibility for defects therein, upon conflicting evidence, which may be overthrown by a preponderance of evidence before the jury, but it means unintentional misapprehension or ignorance of some material fact, and it must be clearly established by the evidence, and so gross and palpable that it is equivalent in its effects to dishonest, fraudulent, or merely arbitrary action." *Wendt v. Vogel,* 87 Wis. 462, 466, 58. N. W. 764. This principle was recognized by the trial judge, but he seemed to be of the opinion that such powers could not be conferred upon one of the parties to the contract, and this notwithstanding the fact, fully recognized, that this court has repeatedly enforced contracts where they were agreed to be performed to the full satisfaction of one of the contracting parties. *Exhaust V. Co. v. C., M. & St. P. R. Co.* 66 Wis. 218, 28 N. W. 343; *Warder, Bushnell & Glessner Co. v. Whitish,* 77 Wis. 430, 46 N. W. 540; *Parr v. Northern E. M. Co.* 117 Wis. 278, 93 N. W. 1099; *Manning v. School Dist.* 124 Wis. 84, 102 N. W. 356.

Given the premise that one may lawfully contract to perform certain work according to plans and specifications to the satisfaction of a third party, and that contracts to be executed to the satisfaction of one of the contracting parties will be enforced, it is difficult to appreciate the logic which condemns a contract to be performed according to plans and specifications to the satisfaction of the other contracting party. Certainly no consideration of public policy calls for the condemnation of one that does not also condemn the

other.. The powers and duties of the one appointed as arbiter are not materially different in the one case than in the other. In neither case can the arbiter act arbitrarily or capriciously." There must be the exercise of honest judgment, and the person performing the contract is not to be denied the fruits thereof by a fraudulent, arbitrary, or capricious action on the part of the other.

Such considerations, however, do not constitute the underlying reason for upholding the contract. That reason is well stated in *Delaware & H. C. Co. v. Pennsylvania C. Co.* 50 N. Y. 258, as follows:

"When the parties stand upon an equal footing, and intelligently and deliberately, in making their executory contracts, provide for an amicable adjustment of any difference that may arise, either by arbitration or otherwise, it is not easy to assign at this day any good reason why the contract should not stand and the parties made to abide by it, and the judgment of the tribunal of their choice."

Whether this is a wise or provident contract is entirely beside the question. That is something with which courts are not concerned. There is no doubt that parties may contract in such cases to submit such differences to an umpire or arbiter and agree that his decision shall be final. The validity of that agreement is not dependent upon the relation which the arbiter bears to the parties. They may agree to partial as well as impartial arbiters if they see fit to do so. Courts have no reason to interfere with the rights of parties to voluntarily contract in the one case that they do not have in the other. We therefore hold that this provision of the contract is valid and operates to confer upon the commissioners the same powers that are conferred upon architects by similar provisions in building contracts.

But this does not settle the case, as the trial judge seemed to think, as indicated by the suggestion in his opinion that if the provision be thus construed there was nothing left for the court to do but to render judgment on defendant's coun-

terclaim.   True, it does mean that some dignity attaches to
the findings of the commissioners that the contract has not
been performed in accordance with the specifications, which
findings were accorded scant consideration by the trial court,
to put it mildly,   In fact, it means that their findings con-
cerning the amount of material remaining unexcavated to
complete the contract are final, binding, and conclusive un-
less impeached for fraud, error, or mistake so gross as to
amount to constructive fraud on their part.   This applies as
well to other delinquencies on the part of the contractors, if
there be any.   Notwithstanding this, however, the question
of the ultimate right of the plaintiffs to recover is for the
determination of the court.

The plaintiffs urge numerous reasons for the avoidance
of the rather disastrous effect of the findings of the com-
missioners upon their right to recover, which we will now
consider.

As we proceed, it is necessary to bear in mind certain facts
not yet appearing.   As set forth in the statement of facts,
it was found necessary to prosecute a considerable portion
of the work by the use of a floating dredge.   The proper and
efficient way of using a floating dredge is to dig down
stream.   The water from above then fills the ditch and is
held back by the lower end thereof against which the dredge
is working.   Thus sufficient water is maintained to keep the
dredge afloat and up with its work.   The water, too, carries
the loose material and *débris* down stream ahead of the
dredge and the ditch cleans itself.   In digging up stream it
is necessary to build dams below the dredge for the purpose
of holding water to enable it to continue its progress up
stream.   In such case the slush and mud stirred up by the
dipper of the dredge floats under the dredge and back down
the ditch where it lodges somewhere along the course and
fills up the ditch.   The dams must be removed and, when that
is done, slush, mud, and *débris* are let down the ditch below
the dam and tend to fill up the lower stretches of the ditch.

As already stated, at or about the time the contractors claimed to have completed the work the commissioners found 38,480 cubic yards in the bottom of the ditches which it was necessary to excavate in order to bring the ditches to the grade required by the plans and specifications. The contractors claimed that this resulted from material that had filled into the ditches after they had been dug; that the ditches had been dug to grade in the first instance; that it was the duty of the commissioners to keep them free and clear; and that the contractors were not obliged to re-excavate. This contention attracts attention to that provision of the contract which provides that "no ditch or lateral shall be finally accepted until completed for its entire length, and until such acceptance the contractor shall keep such ditch or lateral in good condition or repair at his own expense until it is finally accepted by the commissioners." The court construed this provision as requiring acceptance on the part of the commissioners of each ditch, main, or lateral as it was completed. Plaintiffs' attorneys contend for that construction here. The question is not very material in view of the fact, as the trial court found, that even though the commissioners were obliged to accept each ditch upon its individual completion, no request therefor was made by the contractors, because of which he held them responsible for the removal of 10,000 yards of earth in the West main which he found they had not removed. Nevertheless, the question of the proper construction of the contract is here, and we should dispose of it.

It will be observed that the language quoted is negative, and prohibits the commissioners from accepting any ditch until completed for its entire length. This language might justify an inference that upon such completion the ditch was to be so accepted, if such an intent could find support in other provisions of the contract or the conduct of the parties. We fail to discover any such intent revealed in the written contract, and the conduct of the parties in fact

negatives such intent. That the commissioners did not so construe it is certain. That *Keachie* took the same view is evidenced by his testimony. At the trial the court asked him this question: "Why didn't you make a demand for payment of the balance due on each ditch when you completed it?" *Keachie* answered: "Because it was not in accordance with the contract." In order to give the construction contended for it is necessary to infer a positive provision that each ditch shall be accepted upon its completion from a negative provision that it shall not be finally accepted until completed for its entire length. The inference is by no means inevitable, and in view of the obvious contrary construction by both parties we do not hesitate to repudiate it.

But a brief review of the situation, we think, will demonstrate that the construction contended for by plaintiffs would not result to their material advantage. Even though the commissioners were obliged to accept a given ditch upon its completion, it must be conceded that they were under no obligation to do so until the ditch tendered for acceptance was completed throughout its entire length. It appears that in digging the East main ditch they started at the head and dug as far as the Northwestern Railway Company's tracks, in 1912; that the 870 feet lying between that company's right of way and Lake Monona were excavated in the latter part of the year 1913, and that the 100 feet across said right of way were not excavated until July, 1915. This ditch, therefore, was not completed throughout its entire length until about the time the contractors claimed to have completed the contract, it being about the last work they did. Clearly, there was no time when the contractors could have demanded acceptance of this ditch, thereby relieving them from the duty of keeping the same clear. As to the West main ditch, the court found that it never was dug deep enough and that there were 10,000 yards of unexcavated material in the bottom thereof, the cost of the removal of which he deducted from the contract price. It would seem

clear that they were never in a position to demand the acceptance of this ditch. As to lateral W-8, it appears that the contractors deepened the same for a distance of 1,000 feet just before their so-called completion of the contract. Measurements were taken in lateral E-2 immediately after its completion in June, 1915, and it was found that 449 cubic yards therein remained unexcavated, and similar observations are justified with reference to other ditches. Furthermore, not a single ditch was completed to a one-to-one slope, as required by the contract. The reason for not doing so is stated by *Keachie* as follows:

"I stated to the commissioners that a one-to-one slope could not be dug with a floating dredge, and after the ditch was constructed I stated that the slope of the ditch would approach an angle of forty-five degrees, that is one to one, due to the effect of erosion and frost, and that dirt does not support itself. I explained to the commissioners that by digging the ditches wider at the bottom the banks in sloughing in would approximate a one-to-one slope. I made that explanation twice. The second time was when Sacket and I went to Mr. Riley after receipt of the commissioners' letter of December 19, 1911. Early in 1913, when we purchased the small dredge, I stated that we would dig the laterals with that machine, making them wider at the bottom and with more perpendicular slope; that we would do the best we could to get a one-to-one slope. I made that explanation to show why they were not getting a one-to-one slope. They had it in their specifications and they were ignorant."

The record discloses nothing more nearly approaching a modification of the contract than the testimony quoted. There is no evidence whatever that the commissioners waived the one-to-one slope, or that there was any agreement as to the increased width or the increased depth that should be given these ditches in lieu of the one-to-one slope. *Keachie* represented that by digging the ditches in this manner they would eventually take the one-to-one slope, and the district would get the ditches called for by the specifications. This was an important matter, because it appeared that a

one-to-one is an ideal slope for a drainage ditch. We cannot hold that the one-to-one slope was waived, nor that the deeper and wider ditch satisfied the requirements of the contract. The commissioners went no further than to permit the contractors to have their own way as to the method employed in producing a ditch that should satisfy the requirements of the contract. Ditches not dug to a one-to-one slope, therefore, did not respond to the requirements of the contract, and the commissioners were under no obligation to accept them, even though the contract be construed as requiring such acceptance upon completion of each particular ditch.

The contractors further contend that the commissioners waived their right to object that the work was not done according to plans and specifications, by reason of the fact that payments were made from time to time as the work progressed under the provisions of the specifications that "intermediate payments based upon approximate estimates for work performed during the preceding month will be made during the first week of each succeeding month during the progress of the work, and will be payable on or about the 15th day of each succeeding month. Such payments shall be eighty per cent. of the contract price for the work that shall be completed to the satisfaction of the commissioners or such other portion or percentage thereof as may be agreed upon between the parties hereto, and the remainder of the contract price shall be paid within ten days after the completion of the contract to the satisfaction of the commissioners." It is settled in this state that

"Where a building contract provides that the building shall be constructed according to certain plans and specifications to the satisfaction of the supervising architect, who shall inspect all material and work as the building is constructed, with power to reject any material or work not deemed by him to be in compliance with the contract, and to require unsatisfactory constructions to be removed and the work done over in a satisfactory manner, the manifest intent

is that unsatisfactory material or construction shall be promptly rejected, and that the architect shall not, by silence, allow unsatisfactory construction to proceed to a point where its removal from the building will be attended with serious loss to the builder, and then reject it; that a failure to reject material or work seasonably, and in the manner contemplated by the contract, operates as a waiver of defects in regard thereto and an irrevocable acceptance of such material or work as satisfactory under the contract, in the absence of some clear, unmistakable provision in such contract to the contrary." *Ashland L., S. & C. Co. v. Shores,* 105 Wis. 122, 127, 128, 81 N. W. 136.

This rule applies where the work of construction proceeds under the supervision of the architect who is required to inspect all material and work as the building is constructed and has power to reject any material or work not deemed by him to be in compliance with the contract. The rule simply gives effect to the intention of the parties as expressed by their contract. In other words, it derives its force from the contract, and applies only where the work and material are to be inspected as the construction proceeds. While the construction work here was not that of a building, no reason is perceived why the same rule might not apply if such appeared to be the intention of the parties. Manifestly, inspection as the work proceeds should be a prerequisite to the application of the rule. The contractor should be charged with some responsibility. Where he contracts to do a certain thing in a certain manner and in accordance with certain specifications it is his duty to make his work comply with the contract and specifications unless he is relieved from that duty by the terms of the contract itself. The contract here does not provide for inspection. The intermediate payments were to be based upon approximate estimates. On the assumption that the ditch was dug to the required prism, these estimates were very simple, in the computation of which the only factor to be ascertained was the distance dug or traversed during the month. As a matter of practice, the estimates were approx-

imated in this way. No attempt was made to take accurate measurements of the work in order to arrive at these estimates, and this was thoroughly understood by the contractors. Furthermore, owing to the manner in which the ditches were dug, actual measurements were impracticable, for the reason that a considerable portion, if not all, of the ditch dug during the month was filled, partially at least, with water, mud, and slush kicked back by the operation of the dredge, and the bottom of the ditch had not assumed stability or permanent form. Under the circumstances, we hold that the rule of the *Shores Case, supra,* does not apply, and this is not affected by the fact that commissioners, from time to time, called the contractors' attention to manifest irregularities in the work, such as that two of the laterals headed up stream where they opened into one of the main ditches, that certain other places required straightening, and that other portions of the work were, obviously, not to grade. These were discrepancies manifest upon casual observation and did not call for technical inspection or actual measurement.

The contractors further claimed a waiver on the part of the commissioners by reason of the following circumstances: In an annual report filed by the commissioners with the circuit court on July 1, 1914, occurs this paragraph:

"Said commissioners do further report that the work of excavating and construction of ditches according to plans approved by the court is progressing in a satisfactory manner, with the exception that the contractor seems to be unable to do the work as rapidly as the property owners and commissioners wish it done."

It further appears that on April 11, 1914, George Riley, one of the commissioners, wrote to the plaintiffs that he was instructed by the commissioners to request that a renewal bond be furnished. The surety company, as a condition

precedent to the issuance of a new bond, caused the following stipulation to be drawn and signed:

"Stipulated by *George R. Keachie* and *Howard L. Dessert* of Madison, Wisconsin, principals, the Title Guaranty & Surety Company of Scranton, Pennsylvania, surety, and the commissioners of Starkweather drainage district, Dane county, Wisconsin, obligee, on that certain bond or undertaking, dated on or about the 19th day of March, 1913, in the sum of nine thousand ($9,000) dollars, conditioned for the performance of a contract, dated the 3d day of February, 1913, between said principal and said obligee, for the construction of ditches, drains, and laterals at the Starkweather drainage district:

"First. That said contract has been satisfactorily performed to date hereof in accordance with its terms and to the satisfaction of said obligee, except in so far as the time for completion is concerned;

"Second. That the time for the completion of said contract be, and hereby is, extended to and including the 1st day of January, 1915;

"Third. That the time within which any action may be brought against the surety on said bond is hereby extended to June 1, 1915.

"Signed and sealed this 27th day of May, 1914.
                    "KEACHIE & DESSERT,
                        "By George R. Keachie.
                    "THE TITLE GUARANTY & SURETY CO.,
                        "By (signed but name not readable)
                    "Attest: J. H. Law, Secretary.
                    "STARKWEATHER DRAINAGE DISTRICT,
                        "By George C. Riley, Treas."

In view of the undisputed facts, it is difficult to understand the reason, motive, or purpose of the commissioners in making the (quoted) observation in their report to the court. The same is true of the stipulation above set forth. As to the stipulation, the evidence is clear that the commissioners did not authorize it to be signed by Mr. Riley, who purported to sign it on behalf of the commissioners. In fact, it satisfactorily appears that the whole matter was

handled by Mr. Riley himself without the knowledge of the other commissioners, and that it in fact does not constitute the act of the commissioners. But however that may be, we see no reason for holding that what was said in the report of the commissioners to the court, or in the stipulation either, constitutes conduct on the part of the commissioners which reacted either in the nature of waiver or estoppel. So far as the report is concerned, there is no evidence that the contractors ever read it, or knew of this assertion which it contained, nor that they relied upon it, nor that their future conduct was in any manner influenced by it. While they knew of the stipulation, presumably, there is no suggestion that their future conduct was in any manner controlled or affected thereby, or that they were led to act to their damage in reliance thereon. In fact, it affirmatively appears that numerous corrections were made in the ditches after the date of the report as well as the stipulation, which conduct negatives the idea that the contractors construed either document as an expression by the commissioners of their satisfaction with the work already completed or as indicating their acceptance thereof.

In the statement of facts we have set forth the only new provision of the second contract which provides for the payment of damages for failure to complete the contract within the specified time. The trial court construed this provision as one calling for a penalty instead of liquidated damages. In this we think the court was in error. The amount allowable thereunder, and which defendants claimed, is $2,163.04. A more difficult situation for the computation of actual damages could hardly be imagined. It was pre-eminently a case justifying a provision for stipulated damages. The parties so designated it in the contract, and while such designations are not given effect by courts, if they appear to have been used ill-advisedly and not to express the real intention of the parties *(Grant M. Co. v. Marshall & Ilsley Bank,* 166 Wis. 547, 165 N. W. 14) we see no indication that the parties

here did not intend it to be what they called it. The provision should be construed as one calling for liquidated damages.

We think the court erred in refusing to credit the defendants with $100 advanced to the Chicago, Milwaukee & St. Paul Railway Company, as security for the expense of opening the railway bridge over lateral E-2 and in allowing $61.62 to the plaintiffs for the cost of the removal and replacement of the bridge at the point where lateral E-2 crosses the right of way of the railway company. It will be unnecessary to prolong this opinion by a recital of the evidence bearing upon these items.

We are impressed that there is another very troublesome barrier to plaintiffs' recovery. The plaintiffs are seeking to recover on the contract. It is an entire contract, and in order to recover they must show substantial performance. The court found that the cost of completing the contract was $1,875, even ignoring the findings of the commissioners. We do not decide whether, under the circumstances, a finding that the contract had been substantially performed could be sustained. We do no more than suggest that it would require rather generous consideration to do so. This feature should have the serious attention of the trial court on a new trial.

We appreciate that there is little left of the case, yet we do not feel that we can or should render judgment. We think the plaintiffs should be accorded the opportunity of impeaching the findings of the commissioners, if they can. No attempt to this end was made, and in fact was not necessary, in the view the court took of the case. Justice requires that they be not deprived of the opportunity now. Another reason why we cannot render judgment is that we have no way of estimating the expense of completing the contract, unless we be governed by the unit cost of excavation applied by the trial judge to the 10,000 yards which he found to remain unexcavated. There is no evidence that this applies to other portions that must be excavated. However, it will not be

necessary to retry the case *ab initio*. The testimony taken on the former trial may be considered as in the case upon a new trial, and only such additional testimony as may be necessary to meet the views of the court as expressed in this opinion need be taken.

*By the Court.*—Judgment reversed, and cause remanded for further proceedings in accordance with law and with this opinion.

ESCHWEILER, J. *(dissenting)*. I concur with the construction given by the majority opinion to the provision in the contract as to liquidated damages and as to the small items mentioned.

I think, however, that the doctrine invoked by defendant as to the controlling and final effect to be given to the commissioners' determination upon all questions concerning the execution of the work and interpretation of the specifications while, as held by the majority opinion, applicable here upon questions which they answered in their own favor, is equally applicable and binding upon questions arising during the work and answered in effect by the commissioners in plaintiffs' favor. In other words, that in fairness such a sword placed in their hands by the contract should be two-edged and cut both ways. It was expressly so held in *Chicago, St. F. & C. R. Co. v. Price,* 138 U. S. 185, 194, 11 Sup. Ct. 290.

The contracts and specifications made parts thereof required plaintiffs to do this work "under the control, direction, and supervision of the commissioners and their engineer."

The term "engineer" was defined as such person "as shall be employed by the commissioners to superintend, under the direction of said commissioners, the construction of said proposed work." Such an engineer was appointed and acted.

The commissioners were defined as the persons appointed and "who are possessed of the powers and charged with the duties provided in chapter 419, Laws 1905," etc.

Under this same chapter and by sec. 1379—15, Stats., the

commissioners are required to give a bond conditioned for the faithful discharge of their duties and faithful accounting for and application of all moneys. By sub. 6 of the same section it was provided that on the first Tuesday of July of each year they shall file with the clerk of the court an itemized statement of receipts and disbursements "and an additional statement of the length of the ditch or ditches dug, with their *width, depth,* prices per cubic yard, and all such other items as shall be necessary to give an intelligible understanding of the expenditures of all moneys disbursed, and leave said report in said office for examination by parties interested at all times."

This statutory provision as to the statements of the width and depth of the ditches dug was deliberately ignored and disregarded by the commissioners, and in none of the statements filed by them during this period was such requirement complied with, and in two of such annual statements they expressly say they have "made no detailed inspection of the ditches and laterals for the reason that none of the work has been accepted, and under the contract the contractor is compelled to keep the ditches and laterals in repair until the work is accepted."

The conclusion seems to me clear that these commissioners and their engineer were charged with the constant and continuous duty of inspection and supervision of the work as it progressed. The very fact that the statute required them to report to the court, for the benefit of those whose money was being expended, the width and depth of the ditches dug is an express mandate of the law under which they are acting, requiring that they inform themselves constantly as the work progressed, not only of the length of the ditches that were being dug, but of the equally important features as to the width and depth. It is evident from the testimony this could have been ascertained from time to time by the commissioners and the engineer as the work was progressing nearly if not quite as well as it was done in 1915 when the work was practically over. They could not interpret the

contract to the effect nor lawfully insert any provision in the contract having an effect that would nullify the plain statutory duty imposed upon them.

Payments were constantly being made by these commissioners to the plaintiffs for the work being done. Such payments were made under and pursuant to the provision in the specifications which has been cited in the majority opinion, but for convenience is here repeated and reads as follows:

"(3) Intermediate payments based upon approximate estimates, for work performed during the preceding month, will be made during the first week of each succeeding month during the progress of the work, and will be payable on or about the 15th day of such succeeding month. Such payments shall be eighty per cent. of the contract price for the work that shall be completed to the satisfaction of the commissioners or such other portion or percentage thereof as may be agreed upon between the parties hereto, and the remainder of the contract price shall be paid within ten days after the completion of the contract to the satisfaction of the commissioners."

There is no provision in the contract here involved, or in the specifications, which in any wise qualifies the language above quoted with reference to these intermediate payments. The situation, therefore, is totally different from that in many cases upon building contracts where provisions are ordinarily inserted to the effect that such intermediate payments shall not be construed as an acceptance of the work, a particular instance of which may be found in *Siebert v. Roth,* 118 Wis. 250, bottom of p. 251, 95 N. W. 118. Some such equivalent restriction as appears in that case can be found in the standard form of agreement between contractor and owner issued by the American Institute of Architects and under which a large number of building contracts are performed.

The provision above quoted authorized payments to be made by the commissioners for work that shall be completed to the satisfaction of the commissioners and the payments to be eighty per cent. of the contract price for such work.

Keachie v. Starkweather D. Dist. 168 Wis. 298.

This provision evidently charges the duty upon the commissioners to pay for work which is completed to the one hundred per cent. satisfaction and then a withholding of the twenty per cent. of the contract price until the final completion of the contract, and not a payment for work which has been completed only up to the eighty per cent. of the requirements of the contract. They are plainly required to see to it that no payments shall be made for any length of ditch claimed to have been excavated unless such length of ditch has been done to their satisfaction, and this should be held to mean completed not only in length but in depth and width.

I can see no grounds upon which it can be inferred that the *satisfaction* of the commissioners as to the completion of the work upon which they make partial payments is any different from the *satisfaction* of the commissioners when the remainder of the contract price is to be paid. It must be final and not subject to subsequent change or revocation. The nature of the work was such that it is self-evident that it would be a very expensive process for the contractor to return to a ditch or lateral upon which work had once been done and do further work therein. The commissioners had absolute control of the situation by their power to direct and supervise, and when the work was not progressing to their satisfaction as to the requirements of length or width or depth they might refuse such partial payments until the work was so done, and their determination in that regard would be final and decisive on the plaintiffs. Having by their payments in effect recognized that the work in the ditches for whose length the payments were being made were completed to their satisfaction, they ought to be bound thereby. How else could they comply with the statutory conditions for a faithful discharge of their duty and faithful accounting for an application of all the moneys received by them unless and except they saw to it that the work under their direction and supervision was being done to their satisfaction at the time they thus disbursed the money?

I think, therefore, that these payments were not in the nature of so-called progress certificates, but were absolute and binding as a determination of matters which were then possible of ascertainment (see *Hebert v. Dewey,* 191 Mass. 403, 411, 77 N. E. 822) ; and that the work being done here under the control and direction of the engineer and commissioners is within the rule recognized as to building contracts in such cases as *Ashland L., S. & C. Co. v. Shores,* 105 Wis. 122, 131, 81 N. W. 136; *Laycock v. Moon,* 97 Wis. 59, 72 N. W. 372.

I think also that their acts in entering into the second contract, which would have been a perilous thing to do if at that time the contractors were committing such serious breaches of the first contract as it is now claimed they did; their statements filed with the clerk certifying in effect to the fact that the work was progressing satisfactorily except as to the question of speed; their obtaining the new bond from the surety company upon the stipulation signed by one of them, also expressing satisfaction with the work, all are of weighty consideration in determining that the commissioners should be estopped from now going behind the indicated satisfaction with the work from time to time, as shown by their partial payments. I do not think they should be permitted to take the stand that they, as trustees, have overpaid these contractors for work which was being done before their eyes and under their supervision on the claim that they are now not satisfied with the same.

VINJE, J. I concur in the foregoing dissenting opinion of Mr. Justice ESCHWEILER.

ROSENBERRY, J., took no part.