SCHULTZ and another, Appellants, vs. THREE LAKES DRAINAGE DISTRICT, Respondent.

*October 19—November 15, 1921.*

*Drainage districts: Contract for construction: Performance of unenforceable agreement: Failure to comply with contract: Excuse: Waiver by commissioners: Payments on estimates: Substantial performance.*

1. Where contractors engaged in excavating drainage ditches complied with an unenforceable oral agreement with the drainage commissioners to begin excavation at a certain point in the drainage district, they could not thereafter be heard to say that the oral agreement was not binding nor that they were damaged thereby; even though the commissioners insisted upon compliance therewith.

2. That a ditch could not be dug according to specifications by a floating dredge without proper conditions as to water, and that, without fault of the commissioners, there was not at times sufficient water to float the dredge at the necessary height, does not excuse the contractors from compliance with their contract.

3. Although the contract provided that the commissioners might stop the work in case the contractors wilfully refused to comply with its terms, they might also insist on full performance; and payments on monthly estimates, accompanied by protests as to imperfection in the work, do not amount to a waiver of compliance with the specifications.

Schultz v. Three Lakes D. Dist. 175 Wis. 318.

4. Where the work done has accomplished the essential purpose sought, and the defects are susceptible of remedy so that an allowance out of the contract price will afford full indemnity to the district, the contractors have substantially performed the contract.

APPEAL from a judgment of the circuit court for Oneida county: A. H. REID, Circuit Judge. *Affirmed.*

Action to recover damages claimed to have been sustained by the plaintiffs in prosecuting the work of digging ditches in the defendant drainage district because of the acts committed or directions given by the defendant during the progress of the work. The area to be drained sloped generally toward the northeast and the main outlet ditch emptied into Range Line Lake, situated in the northeast corner of the drainage district. The main contentions urged by the plaintiffs upon appeal are that they were compelled to begin the work in the northeast part of the district, thus losing the water behind their dredge unless dams were erected to retain it; that defendant opened a small drainage ditch which existed when they began work, causing loss of water; that a dam in the main outlet ditch was opened; that they were required to dig in such a way that frequent new starts had to be made, requiring the movement of the dredge from one place to another, and that they were not permitted to extend one ditch into Thunder Lake, situated at the southwestern edge of the district, from which lake they claimed they could have obtained an adequate flow of water and the water of which was claimed was to be lowered four feet. The issues will appear from the findings of fact and conclusions of law made by the trial court. They are as follows:

"1. The plaintiffs and defendant duly made, executed, and entered upon the performance of the contract, a copy of which, together with the specifications therein referred to, is annexed to the complaint. In making said contract there was not a complete meeting of the minds of the plaintiffs and the defendant's commissioners in respect to the time of completion of the work. Plaintiffs understood that they

were to have until January 1, 1917, for completion, whereas the commissioners understood that the time fixed was January 1, 1916. By inadvertence the plaintiffs did not observe, before signing the contract, that the date January 1, 1916, had been inserted as the date for completion.

"2. At the time of executing said contract, and in consideration of being awarded the same, the plaintiffs orally agreed with the defendant's commissioners that the plaintiffs would set up their dredge and begin excavating at the east end of the ditch known as Lateral 8, and first excavate Lateral 8 and North and South Main ditches, in order to provide for prompt drainage of the northeastern part of the district, and thus allow of its early improvement and cultivation. Commissioner Clark G. Kuney owned, or had an interest in, and controlled at least three fourths of all the land in the district, including the northeastern portion, and was anxious to begin to demonstrate the desirability of the land when drained.

"3. Plaintiffs proceeded to do the work with a standard floating dredge. Pursuant to aforesaid oral agreement plaintiffs set up their dredge at the east end of Lateral 8 and began excavating on August 30, 1915. After excavating Lateral 8 they turned south on Lateral 1 to reach some needed water, going south nearly to the junction with Lateral 2. They then, at the request of the commissioners, backed up north to the junction with South Main, excavated west on South Main for 4,000 feet, then backed up at the request of the commissioners to the junction with Lateral 8 and excavated north to junction with North Main ditch, then northwest and west on the North Main about one mile, then returned and excavated toward the outlet, stopping just west of the railroad track, at which point a dam, partly natural and partly artificial, was left to retain the water. Then they ran south to the junction with Lateral 2, constructed a dam in Lateral 1 at the north side of their dredge and began excavating westward on Lateral 2, and had proceeded from 600 to 800 feet westward when winter set in and stopped further operations. The course of excavation to this point was taken not because of any arbitrary demand or any exercise of authority on the part of the commissioners, but in accordance with the oral understanding had at the time of the making of the contract and according to re-

quests of the commissioners. Approximately three miles in length of ditches were thus excavated in 1915. Of this portion approximately one half was excavated in reasonable compliance with the plans and specifications, leaving banks with a slope of approximately one to one and a bottom not materially wider than specified. The other half of said portion was not excavated according to plans and specifications in that it was dug with sides much steeper than a one-to-one slope and with bottom much wider than four feet. The failure of compliance with the plans and specifications was due mainly to lack of sufficient water to float the dredge to the necessary height for correct operation. In order to enable the excavation of a ditch of this character so as to leave a narrow bottom and a uniform slope at sides of one to one, it is necessary that the ditch shall be substantially filled with water so as to float the dredge high. In case the dredge is floated low it is necessary to excavate the bottom to sufficient width to allow the passage of the scow, which in this instance was fourteen feet wide, and this results in substantially perpendicular sides.

"4. Plaintiffs arrived at Three Lakes with their dredge equipment in early August, 1915, and it required until August 30th (including some unusual delays) to set up the dredge and other equipment and be prepared for excavation. At the time of arrival there was an abundance of water on the district. About the time of such arrival, or shortly thereafter, Commissioner Aldrich, by direction of Commissioner Kuney, in whose employment Aldrich then was, and against the protests of plaintiffs, opened up a small surface ditch which had existed for some years along the north side of an old road extending east and west across the marsh and lying next north of the line of Lateral 8 and South Main ditches. By means thereof considerable water was drawn from the marsh in the vicinity of Lateral 8 and the east one-half mile of South Main ditch. This, together with a drought in August, 1915, left insufficient water to properly float the plaintiffs' dredge when ready for operation. This draining was done for the private advantage of Commissioner Kuney, but without any wrongful intent, but with sufficient means of knowledge that the same might interfere with the operations of the plaintiffs. The opening of the old ditch by Aldrich materially decreased the amount of water

available and delayed the start and hindered the work of plaintiffs' excavating, to plaintiffs' damage in the sum of $200, and materially contributed to the imperfect excavation of about one and one-fourth miles of ditch, because of lack of water, and therefore the floating low of the dredge. The balance of the imperfectly excavated ditch done in 1915 was so imperfectly excavated solely because plaintiffs failed to build and maintain sufficient dam behind their dredge when they began excavating westward on Lateral 2. The opening of the old ditch by Commissioners Aldrich and Kuney was contrary to their implied obligation as commissioners to avoid interfering with the natural conditions of the marsh, upon which the plaintiffs had a right to rely in making their contract.

"5. In the fall of 1915, in order to enable the commissioners to draw off the water from the northeastern corner of the drainage district from the ditches already excavated in North and South Main and Laterals 1 and 8, it was agreed between the plaintiffs and the commissioners that the plaintiffs would erect a dam, or dams, behind their dredge as the same proceeded south and west, and that this would permit the opening of the outlet toward Range Lake, and that the commissioners would furnish the lumber for the construction of such dams and remove all dams after the use of same had ceased. Some such dams would in any event have been necessary to enable plaintiffs to properly float their dredge. After the construction of a dam by the plaintiffs the commissioners opened the dam leading to the outlet to Range Lake, but by reason of imperfect construction of such dam behind the dredge, and without fault on the part of the commissioners, said dam leaked and washed out and required reconstruction, and caused delay. This hampered the further operation of the dredge and caused the excavation of ditches imperfect in their construction, to the end of the season.

"6. Plaintiffs resumed work on the excavations in the spring of 1916, going west on Lateral 2 and south to a point eighty feet north of Thunder Lake and thereafter proceeded with their work according to their own plans and judgment, finishing and tendering the ditches as completed about October 15, 1917. In so doing plaintiffs excavated 162,000 cubic yards of earth taken from the theoretical prism of the

ditches as shown by the plans and specifications. Said ditches aggregated 11.9 miles in total length. Approximately three miles in length thereof were dug in 1915, five miles in 1916, and four miles in 1917.

"7. After the execution of the contract in question, on June 26, 1915, plaintiffs and the defendant's commissioners agreed to co-operate together to secure the putting in of a sidetrack on the Chicago & Northwestern Railway at or near the east end of Lateral 8 of the district. The commissioners agreed to grade the roadbed therefor and petition the railway company for the laying of the sidetrack, and to otherwise push completion of the same, and the plaintiffs agreed to pay the sum of $125 toward the expense thereof; it being then intended to secure said sidetrack, if possible, in time to enable plaintiffs to have their dredge and other equipment delivered thereon in preparation for unloading and the actual work. Said sidetrack was not secured in time to enable plaintiffs to have their equipment delivered thereon, but was soon thereafter completed and was used throughout their work by plaintiffs in the delivery of coal and other materials. There was no breach of contract in relation thereto on the part of the commissioners.

"8. Of said 11.9 miles of ditches 2.4 miles in length were constructed in fair compliance with the plans and specifications, one and one-fourth miles thereof were imperfect by reason of the drainage off of water by the commissioners in August of 1915, and 8.25 miles thereof were imperfect as to slopes or banks and width of bottom, due to improper handling of their dredge by the plaintiffs. Said nine miles were not excavated to a one-to-one slope on the sides, but with more nearly perpendicular sides. The bottoms thereof were much wider than four feet. There was no fault or interference on the part of the commissioners contributing thereto. Said ditches are not as good as ditches dug according to the plans and specifications because the sides thereof will cave and tend to fill the ditch at its deepest place more quickly, and to obstruct the flow of water more than if said ditches were properly constructed. To make said ditches as good as those specified in the plans and specifications will require that the upper edges, or lips, of each bank should be removed so as to prevent the same from caving, and such portions as have already caved should be removed. The work

of thus remedying the defects may be done to advantage while the district is engaged in cleaning out from the bottoms of the ditches the deposit which the natural and unavoidable action of the elements has placed there.   The work of cleaning out and perfecting said ditches could be done at a cost of $700 per mile, one half of which cost would redound to the benefit of the district and one half would be due to the imperfection of said ditches.   The defendant district suffered loss and damage, without fault on the part of its commissioners, by reason of the imperfections of said ditches, in the sum of $2,837.50.

"9.  Pursuant to the contract the defendant's commissioners and engineer made a monthly estimate of the work done by the plaintiffs and the defendant paid the plaintiffs eighty per cent. of the contract price thereon in accordance with the terms of the contract.   Said estimates of quantity of excavation were not made by strict measurement but were approximate only, and were arrived at only by multiplying the length of the ditch excavated by the estimated quantity of earth removed from the theoretical prism of the ditch according to the plans; except that in two instances deductions were made because the ditch was obviously not down to grade.   The defendant's commissioners repeatedly protested that the ditches were not being excavated according to the plans and specifications, that the bottoms were too wide and the sides too steep, and that the plaintiffs should comply with the terms of their contract, and at no time did the commissioners accept any portion of the ditches as perfected.

"10.  There was no arbitrary, capricious, or bad-faith conduct on the part of the commissioners in their directions to the plaintiffs in the performance of their work.

"11.  Plaintiffs leveled the spoil banks along one side of all of said ditches and constructed thereon such roads as were practicable, considering the material for use, all in accordance with the terms of their contract therefor.   Said roads are in fair compliance with the plaintiffs' contract. Plaintiffs are entitled, therefore, to their contract price of $100 per mile, and no more.

"12.  Defendant has paid to apply upon the contract the sum of $10,320.78, pursuant to estimates made as provided for by contract.

Schultz v. Three Lakes D. Dist. 175 Wis. 318.

"13. Plaintiffs failed to excavate down to grade a small portion of the ditch at the junction of Laterals 1 and 3, and another small portion at the junction of Laterals 1 and 2, and left wholly unexcavated about fifty feet in length of the North Main ditch at or near the center of section 35, being at the point where the flow of water would naturally separate going east and west. Said unexcavated portions may be done without extra expense in excess of contract price by the defendant when perfecting and cleaning out said ditches. The efficiency of the drainage is not affected by the omission to excavate the small portion left unexcavated in the North Main ditch, and no material advantage would be gained by now excavating same. The unexcavated portions at the other two points might readily be done by hand work, without any large expense. The unexcavated yardage at the three points named has not been included within the 162,000 yards found to have been excavated by the plaintiffs.

"14. Defendant district has not taken any steps to perfect or clean out said ditches. While defendant has been authorized by order of the court in the drainage district proceedings to engage in the laying of a system of auxiliary tile drains opening into said ditches, no work of this kind has been done by the district, and it is problematical when, if ever, said work will be done. There is no evidence on a recoverable basis of any damage suffered by the defendant district by reason of the delay of the plaintiffs in completing excavation of the ditches."

### "Conclusions of Law.

"1. Plaintiffs have substantially performed their contract within the terms of the rule regarding substantial performance, and the work done accomplished the essential purpose and the defects are not so essential as to defeat the object of the work, and are susceptible of remedy so that an allowance out of the contract price will give the defendant a full indemnity and give in effect the thing contracted for.

"2. The plaintiffs are entitled to judgment against the defendant according to the following recapitulation:

```
162,000 cu. yds. excavated at 7.99 cents.....$12,943 80
Damages caused by hindrance at beginning.     200 00
11.9 miles of roads constructed at $100....  1,190 00   $14,333 80
```

Schultz v. Three Lakes D. Dist. 175 Wis. 318.

*Contra.*

| | | |
|---|---:|---:|
| Payments made by defendant district......| $10,320 78 | |
| Damages allowed defendant for imperfections of work........................ | 2,837 50 | 13,158 28 |
| Balance ................................... | | $1,175 52 |

"Plaintiffs are entitled to recover said balance of $1,175.52, with interest thereon from November 1, 1917."

From a judgment entered accordingly the plaintiffs appealed.

For the appellants there were briefs by *Buell & Lucas,* attorneys, and *Frank W. Hall,* of counsel, all of Madison; and the cause was argued orally by *Mr. Hall* and *Mr. Frank W. Lucas.*

For the respondent there was a brief by *Martin, Martin & Martin,* and oral argument by *Gerald F. Clifford,* all of Green Bay.

VINJE, J. The trial judge not only heard the evidence but also had a view of the premises. He was therefore in a better position than this court is to determine the facts. His findings of fact disclose a careful and painstaking analysis of the evidence and of the situation and they are sustained by the proof. No question of law not fully settled in the case of *Keachie v. Starkweather D. Dist.* 168 Wis. 298, 170 N. W. 236, is here presented, and we follow and adhere to the law of that case so far as the facts here make it applicable. The opinion of the trial court supplementing his findings discusses the main issues so aptly that we adopt it as our own. It is as follows:

"The court is filing herewith findings of fact and conclusions of law which in the main indicate the court's views upon the questions at issue. No full discussion will be here attempted, but it is desired to mention two or three of the main features.

"It is undisputed that at the time of the making of the contract plaintiffs orally agreed to set up their dredge at

Schultz v. Three Lakes D. Dist. 175 Wis. 318.

Lateral 8 and to excavate certain ditches in the northern and eastern part of the district first. They were not originally bound by this oral agreement, and had they seen fit to disregard it it could not have been enforced. But assuming this to be true, they nevertheless did proceed to comply with their oral agreement and did set up their dredge and did begin excavating as agreed. Having thus carried out their oral agreement, they cannot be heard to say that it was not binding upon them, nor that they are damaged thereby, even though the commissioners may have insisted upon the plaintiffs doing as they did.

"This disposes of most of the plaintiffs' complaint about being required to dig up-hill. After having once located their starting point it was no doubt impracticable to make another start in the second year. They were, however, at perfect liberty to do so, so far as the evidence shows, and had they chosen to remove their dredge to the south end of Lateral 1 no reason is perceived why they may not have done so.

"After commencement of work in the year 1916 plaintiffs proceeded as directly as possible to get the advantage of the water from Thunder Lake. No reason is perceived why they were not able from that time on to get such water as they needed, assuming a proper handling of their work. Even though the ditch was not extended to Thunder Lake, a very simple contrivance for siphoning water from the lake into the south end of Thunder Lake ditch would have supplied them with all the water they needed, if indeed any were needed other than seepage.

"The profiles show that all of North Main, practically all of South Main, the north half of Lateral 1, and all of Laterals 2, 6, 7, 8, and 10, are strictly level. The outlet having been opened by agreement with plaintiffs during the first season, and it being necessary, therefore, to maintain a dam or dams somewhere in the ditches, and the water of Thunder Lake being available, and it being unavoidable that the plaintiffs should dig up-hill on Laterals 1 and 3, unless they chose to move their dredge to the Rhinelander road, no reason is perceived why their course and direction as they themselves mapped it out in the years 1916 and 1917 was not as good as another that might be adopted in that situa-

tion, and I can see no substantial evidence of any interference by the commissioners that in any way hindered or damaged the plaintiffs in those years.

"In nearly all other respects this case is ruled by decision of *Keachie v. Starkweather D. Dist.* 168 Wis. 298, 170 N. W. 236.

"The fact that the ditch specified could not be dug by a floating dredge without proper conditions as to water, and that the plaintiffs did not at all times have sufficient water therefor, in no manner excuses them from compliance with their contract.

"I see no reason to think that the commissioners waived compliance with the terms of the contract and specifications except in so far as has been found in the findings of fact. The making of monthly estimates, and the payments upon account thereof, taken together with the protests of the commissioners as to the imperfection of the ditches, and the terms of the contract, which are almost identical with those involved in the *Keachie Case,* make it clear that there was no acceptance of the ditches as dug when such monthly estimates and payments were made, and that there was no waiver of imperfections. The commissioners were permitted by the contract, in their discretion, to stop the work, or revoke the contract, or both, in case the plaintiffs wilfully refused to comply with any of its terms and requirements. But the contract did not bind the defendant to take this course. The commissioners might continue to insist on performance in accordance with the terms, and both parties from beginning to end continued to insist on the contract continuing in force and effect.

"I can see no basis in the facts for finding that the contract was at any time set aside or overridden, nor any basis for saying that the plaintiffs are entitled to recover *quantum meruit.*

"The question whether plaintiffs' work amounted in the end to a substantial performance of the contract so as to enable them to recover any sum whatsoever is not an easy one of solution. The supreme court expressed doubt on whether the performance in the *Keachie Case* was a substantial performance. Such performance was very much similar to that complained of here. I think, however, that in this case the fact that the grade of so many of the ditches is

Schultz v. Three Lakes D. Dist. 175 Wis. 318.

level makes it quite impossible that there can be any material current in them, and therefore there is not likely to be any material cleaning out or scouring by flow. In such case the narrowness of the bottom of the ditch is not so important as in case of ditches with considerable fall. The defects as to sides I think may be readily remedied, and for these reasons I have concluded that the performance was substantial, within the meaning of the rule.

"I think the foregoing observations, together with the findings, express the views of the court."

Little need be added to the above except to state that the evidence sustains the conclusion that it was understood between the parties that Thunder Lake was not to be tapped by plaintiffs; that they had nothing to do with the lowering of the lake and were to dig their ditch only to within eighty feet of it, as the court found, and then stop, though the map of the district shows the ditch apparently running to the shore of the lake just as the outlet ditch runs to the shore of Range Line Lake. But Mr. Kuney, one of the commissioners, testified that the plans did not call for the tapping of Thunder Lake and that the engineer stated positively to plaintiffs that they were to have nothing to do with Thunder Lake.

Since the case presents only questions of fact that have been correctly determined by the trial court, it is not deemed advisable to further discuss the issues because such discussion would be of no value to the legal profession.

*By the Court.*—Judgment affirmed.