PARK, Appellant, vs. CITY OF MILWAUKEE and others, Respondents.

*March 7—April 3, 1923.*

*Municipal corporations: Contracts for public work: Commissioner of public works of Milwaukee: Determination of amount due contractors: Effect in absence of fraud: Modification of contract: Necessity of writing: Taxpayer's action to restrain payment in excess of amount due contractor.*

1. Under sec. 20 of the Milwaukee city charter, conferring power on the commissioner of public works to adjust and determine all questions as to the amount earned under a contract with the city according to its true intent and meaning, and providing that such adjustment by the commissioner shall be final and binding on the parties, the decision of the commissioner is final unless impeached for fraud, accident, or mistake consisting of more than error in judgment.

2. Where the construction of a breakwater by the city was commenced in 1917 and suspended in November of that year on account of lack of funds, and the sinking of the structure before its final completion compelled the use of a greater quantity of stone than was originally intended, the amount of material for which the contractor was entitled to payment as determined and certified by the commissioner of public works, and the amount allowed by him, although in excess of the original contract, are *held* to be supported by the facts.

3. Where a provision in a contract for the construction of a breakwater that changes of plans and specifications should be by written order was inserted for the benefit of the city, it could be waived by the city; and where material was used in breakwater construction in excess of the amount contemplated in the contract, although such additions were made without regular order, the city, having accepted the structure, waived its right to require a written order for such change.

APPEAL from a judgment of the circuit court for Milwaukee county: GUSTAVE G. GEHRZ, Circuit Judge. *Affirmed.*

This is a taxpayer's action to restrain the payment by the defendant city to the defendant contractor of the sum of $97,995, claimed by the plaintiff to be excess compensation for the construction of a breakwater.

On March 28, 1917, the city of *Milwaukee* contracted with one Arthur H. Vogel for the construction of a breakwater in the harbor, in accordance with certain plans and specifications, for a compensation based on the price of $2.08½ per ton for the rock entering into the structure. Vogel assigned the contract to the defendant *Great Lakes Dredge & Dock Company* and the latter succeeded to all his rights and obligations under the contract.

The breakwater was divided into three sections, the south, middle, and northern section. The controversy here involved relates only to the southern section. Work of construction commenced during the summer of 1917. On October 10, 1917, the contractor was informed that funds available for the prosecution of the work were limited and, because of a lack of funds, the work was suspended November 12, 1917.

The specifications called for a core which was built up by filling in with loose stones. This core was to be protected by heavy riprapping. When work was suspended a considerable portion of this core was unprotected by riprapping. Work was not resumed on the construction until August, 1918. During the late fall of 1917 it had been suggested on the part of the city authorities that an undue amount of stone was going into the construction. The city engineer was ordered to make a survey and ascertain whether the rock deposited was within the proposed lines of the breakwater as revealed by the plans and specifications. This survey was made during the spring and summer of 1917, disclosing that at the time of the survey a considerable portion of the rock which had been deposited was without the lines of the breakwater. This gave rise to a controversy between the authorities having the work in charge for the city, and the contractor, it being claimed, to some extent at least, that the contractor should restore the rock to the space included within the proposed lines of the breakwater.

Many reasons were advanced for the condition revealed

by the survey, it being claimed that an unknown sinking of the bottom of the lake made a broader base necessary, which had a consequent influence upon the lines of the breakwater. It was also claimed that the winds and waves resulting from the fall and winter storms had moved the rock without the proposed lines of the breakwater, and that the city was in a measure responsible for this, because of the enforced suspension of work. During this controversy it was also suggested that the breakwater called for by the plans and specifications was too light to withstand the seas to which it was subjected, and that the interests of the city called for a heavier construction.

Up to the 1st of January, 1919, the contractor had been paid nothing for the stone deposited by him after resuming work in August, 1918, estimate certificates having been withheld by the superintendent of bridges and public buildings, who had supervision of the work, on the ground that the contractor had already been paid for more rock than had been placed within the proposed lines. On January 9th, the city engineer wrote to the acting commissioner of public works as follows:

"I have come to the conclusion that it would have been to the city's interest if instead of the proposed section for the south 1,771 feet, a section with a width 'at the top of ten feet with slopes of two to one had been specified. It does not seem practical, however, to require the breakwater to be built to just those dimensions, inasmuch as the south end is practically completed, but I do believe that it would be fair to the city and to the contractor to accept such stone as lies within a section of such dimensions and to pay the *Great Lakes Company* therefor."

On January 20th the acting commissioner of public works wrote the contractor as follows:

"I have decided that the city will credit you with 99,000 tons of stone delivered and placed in the breakwater to date, with the understanding that you will proceed with due diligence in the construction of the uncompleted portion of the

breakwater according to plans and specifications. . . . It is not to be deemed a final acceptance of the work nor a waiver. of any of the rights of the city under the contract and specifications except as to the dimensions of the south section of the breakwater."

The 99,000 tons of stone represented a greater quantity than was then within the proposed lines of the breakwater, according to the plans and specifications, but did not represent all of the stone which had been delivered and for which the contractor claimed it was entitled to payment. The controversy finally resulted in an offer made by the contractor on April 15, 1919, to finish the breakwater at and for a lump sum. This proposal was referred to the common council. By that body it was referred to a committee and hearings were held. The harbor commission was enlisted to make an investigation and recommendation. The advice of the city engineer was also requisitioned, and the city attorney was consulted throughout the proceedings. The harbor commission reported in part as follows:

"The city engineer's survey shows that the cross-sections of the rubble mound as constructed conforms fairly well with the cross-section shown in the contract plan, except that the three-foot depth of covering stone is not everywhere clearly maintained, nor has it been placed with uniform care; the inside slope has also been lengthened in the south section, but not to an unwarranted degree, considering the exposed situation of the work."

"We have no criticism to offer as to the general alignment of the rubble mound."

"According to the city engineer's survey report there are about 6,000 tons of stone outside of the alignment along the entire length of the work. Making a deduction for this stone, we find that in accordance with the city engineer's surveys the total amount of. stone delivered by the contractor and checked by the city inspector is reasonable, viz. 110,048 tons (as given in the city engineer's report), less about 6,000 tons."

"The surveys made to determine the amount of stone placed in the rubble mound thus far check reasonably close

with the weights obtained by scow measurement. It is impossible to obtain great accuracy in under-water surveys of rough-piled stone."

"With reference to the proposed settlement with the *Great Lakes Dredge & Dock Co.* for work thus far performed, and to complete the structure, the harbor commission can find no excuse for making a lump-sum settlement. In its judgment the proper course to pursue is to require the contractor to complete the contract as per the original agreement, and it is so recommended."

"In the judgment of the commission the contractor is now entitled to payment for the 104,000 tons of stone, more or less, that has already been reasonably placed in proper position, under restrictions specified in the contract, and on condition that he will undertake to complete the contract as recommended above."

On June 30, 1919, the recommendations made by the harbor commission were approved by a resolution of the common council. Settlements were thereafter made on the assumption that the contractor was entitled to compensation for 104,000 tons of stone then in the work. Thereafter work was resumed and the construction finished in November, 1919.

This action was brought to enjoin payment of final estimates. From a judgment in favor of the defendant the plaintiff brings this appeal.

For the appellant there was a brief by *Van Dyke, Shaw, Muskat & Van Dyke* of Milwaukee, and oral argument by *James D. Shaw.*

*John M. Niven,* city attorney, for the respondent *City of Milwaukee* and others.

*Robert N. McMynn* of Milwaukee, for the respondent *Great Lakes Dredge & Dock Company.*

Owen, J. Plaintiff brought this action as a taxpayer to enjoin the payment of the final estimate on the ground that the contractor was being allowed compensation for some 47,000 tons of stone, amounting to $97,995, in excess of

the cubical contents of the breakwater according to the original plans and specifications, which allowance constituted a fraud upon the taxpayers and an unlawful diversion or paying out of public funds. It is not questioned but that the original contract was properly entered into and that all charter and statutory provisions governing the letting of contracts on the part of the city were complied with. The claim is that the breakwater was not built in accordance with the original plans and specifications nor in accordance with any lawful change made in said plans and specifications, and that the city had no authority to allow or pay the contractor for a greater amount of material than was required for the theoretical, mathematical contents of the breakwater as revealed by the original plans and specifications.

With reference to a change in the plans and specifications the contract provided that "all such alterations or changes may be ordered in writing by the superintendent of bridges and public buildings, otherwise they will not be acknowledged and the contractor will be held to the original plans and specifications." It is conceded that, so far as the controversy here involved is concerned, no alterations or changes in the original plans were ordered by the superintendent of bridges and public buildings in writing. It also may be conceded that the amount of material for which the contractor was allowed compensation exceeded the theoretical, mathematical contents of the original plans and specifications, and the question which we are required to consider is whether a taxpayer may restrain the payment for such excess material.

Sec. 20, ch. V, of the city charter confers upon the commissioner of public works power "to adjust and determine all questions as to the amount earned under any contract by the contractor or contractors according to the true intent and meaning of the contract; and such adjustment and determination by said commissioner shall be final between the parties and binding upon them." This provision of the

charter also found expression in the contract in practically identical language. The decision of the commissioner of public works, pursuant to this power, is final unless impeached for fraud, accident, or mistake; "and the mistake here referred to is not a mere error in judgment as to the quality of the work or the responsibility for defects therein, upon conflicting evidence, which may be overthrown by a preponderance of evidence before the jury, but it means unintentional misapprehension or ignorance of some material fact, and it must be clearly established by the evidence, and so gross and palpable that it is equivalent in its effects to dishonest, fraudulent, or merely arbitrary action." *Keachie v. Starkweather D. Dist.* 168 Wis. 298, 304, 170 N. W. 236, and cases there cited.

That a controversy existed between the contractor and the city with reference to the amount of material that was going into the breakwater plainly appears from the statement of facts. This controversy was waged for many months, and in one way or another was brought to the attention of about every department of city government in any wise connected with that or similar enterprises on the part of the city. In meeting the claims and demands of the contractor the city requisitioned the advice, service, and experience of the city engineer, the superintendent of bridges and public buildings, the commissioner of public works, the harbor commission, the city council, the mayor, and the city attorney. There is not the least suggestion of a purpose on the part of any official to betray the interests of the city and to unduly favor the contractor, and in view of the open and notorious manner in which the matter was handled it would indeed be difficult for any one official to accomplish any such result. At the suggestion of the mayor, the head of the city government, the common council referred the matter to the harbor commission for investigation and report, no doubt upon the theory that that was the most appropriate and responsible body to ascertain the facts and

Park v. Milwaukee, 180 Wis. 278.

to formulate the policy which the city should pursue in the pending controversy. That body made a report to the city council in which it found a substantial compliance on the part of the contractor with the terms of the contract, and in its report specified the amount of material which in its opinion the contractor had in position and for which it should be allowed compensation in accordance with the original plans and specifications. This report was approved by a resolution of the city council, and thereafter estimates were certified and approved by the commissioner of public works in accordance with the recommendation. In view of all this publicity, investigation, and conference, how can it now be said that the commissioner of public works acted ignorantly or fraudulently in certifying to the amount of material for which the contractor was entitled to payment? A mere statement of the manner in which the controversy was dealt with by the city most emphatically negatives any such conclusion.

The trial court not only refused to find that the action of the commissioner of public works was characterized by fraud, ignorance, or mistake, but made an affirmative finding that the breakwater was built in substantial compliance with the original plans and specifications. That finding is assailed as unsupported by the evidence. But we think the finding is well supported by the evidence, and this in face of the concession that the material paid for exceeded the theoretical, mathematical contents included within the original plans and specifications. It must not be forgotten that the bottom of the lake proved to be a shallow crust which gave way under the weight of the breakwater, causing the same to sink into several feet of mud. This in and of itself increased the perpendicular lines of the breakwater. It also made necessary a broader base with a corresponding change of slope. It further appears that no such a structure can be built on line and that it is customary to allow one foot leeway in the placing of stone under water.

It will thus be seen that under no circumstances does the theoretical, mathematical contents of the breakwater limit the amount to which the contractor may be entitled; that the sinking of the structure compelled the use of a greater quantity of material, the exact amount of which is difficult to estimate; and that the amount allowed by the commissioner of public works was in harmony with the combined judgment of every department of city government qualified to advise in the premises, with the possible exception of the acting superintendent of bridges and public buildings.

But even though we were obliged to hold that the finding of the trial court that there was a substantial compliance with the original plans and specifications is not supported by the evidence, the result contended for by plaintiff would not necessarily follow. While it is true that the plans and specifications in the particulars under discussion were not changed by written order, the conduct of the city certainly constituted an acquiescence in the established lines of the structure and constituted a waiver of the provisions of the contract requiring changes in the plans and specifications to be by written order. There is no provision of law requiring contracts of this nature to provide for a change of plans and specifications by written order. In this contract that provision was inserted for the benefit of the city. It was a provision which might be waived by the city. *First Sav. & T. Co. v. Milwaukee Co.* 158 Wis. 207, 232, 148 N. W. 22, 1093. The city having the power to waive the requirement, its acquiescence in and acceptance of the structure, as the result of several months' discussion, conference, and negotiation, clearly indicated its intention to do so.

Neither is appellant's contention that the city is paying for something which it did not receive, tenable. There is quite convincing evidence in support of the finding of the court that the original plans and specifications provided for

too light a structure, and that a heavier structure was in accordance with a wiser and more cautious policy.

We can discover no error justifying a reversal, and the judgment must be affirmed.

*By the Court.*—Judgment affirmed.