IN RE LOWER BARABOO RIVER DRAINAGE DISTRICT: LOWER BARABOO RIVER DRAINAGE DISTRICT and others, Appellants, vs. SCHIRMER and another, Respondents.

*March 6—June 24, 1929.*

232

*Wm. R. McCaul* of Tomah, for the appellant Drainage District.

*Daniel H. Grady, in pro. per.,* and *W. H. Farnsworth,* both of Portage, for the appellant Grady.

*H. E. Andrews* of Portage, for the appellants Williams and others.

For the respondents there was a brief by *Hill, Thomann & Beckwith* of Madison, attorneys for the respondent Schirmer, and *James H. Hill,* of Baraboo, attorney for the First National Bank of Baraboo, and oral argument by *Carl N. Hill* of Madison, *James H. Hill* of Baraboo, and *John T. Harrington* of Oshkosh.

The following opinion was filed April 30, 1929:

DOERFLER, J. The contract for the construction of the drainage ditch, entered into between the commissioners and the contractor, among other things contained the following provision:

"All work under this contract shall be done to the satisfaction of the engineer employed by the party of the first part, who shall in all cases determine the amount, quality, acceptability, and fitness of the several amounts of work which are to be paid for hereunder, and shall decide all questions which may arise as to the measurements of quantities and the fulfilment of this contract on the part of the party

of the second part, and shall determine all questions respecting the true construction or meaning of the plans and specifications. In case of dispute between the district engineer and the contractor, the decision of the state engineer shall be taken, and his determination and decision thereon shall be final and conclusive."

It is strenuously argued by counsel for the contestants that this provision of the contract is invalid; that sec. 1379—10c of the Statutes contemplates that the court shall at all times have supervisory power over all acts of the commissioners and of all proceedings in the creation, establishment, and construction of the drainage district; that such a contract provision deprives the court of its supervisory power, and attempts to vest in the arbitrator a power which under the district drainage law must reside in the commissioners and the court; that the authority thus created by the arbitration provision amounts to an invalid delegation of power, in that it substitutes the award of the arbitrator in place of that of the board and of the judicial decision of the court.

The important fundamental issue which is raised in connection with the alleged deprivation of the court of its jurisdiction, under circumstances like those involved in the instant case, is not a new one. It was raised in the case of *Fox v. Masons' F. Acc. Asso. of America*, 96 Wis. 390, 71 N. W. 363, in connection with the submission to arbitration of questions arising under an accident insurance policy. It was there held:

"On grounds of public policy, all agreements between parties to submit the whole subject matter of their differences to arbitration, wholly stipulating away the rights of each or either party to resort to the tribunals created by the law of the land for a determination of such differences, are void and have been uniformly so held. (Citing *Hamilton v. Liverpool & L. & G. Ins. Co.* 136 U. S. 242, 10 Sup. Ct. 945; May, Insurance, § 492; *Leach v. Republic F. Ins. Co.* 58 N. H. 245.) Agreements to arbitrate special matters, such as, under an insurance policy, the amount of the loss, some-

thing that does not go to the whole groundwork of the controversy, have been as universally sustained. (Citing *Viney v. Bignold,* L. R. 20 Q. B. Div. 172; *Scott v. Avery,* 5 H. L. Cas. 811; *Delaware & H. Canal Co. v. Penn. Coal Co.* 50 N. Y. 250; *Reed v. Washington F. & M. Ins. Co.* 138 Mass. 572; *Wolff v. Liverpool & L. & G. Ins. Co.* 50 N. J. L. 453, 14 Atl. 561; *Hall v. Norwalk F. Ins. Co.* 57 Conn. 105, 17 Atl. 356.)"

The arbitration clause in the instant case does not submit all matters in controversy to the arbitrators, with the effect of ousting the court of jurisdiction. The quoted contract provision belongs to the second class of cases above referred to, and not to the first. This provision of the contract in form is like innumerable contracts which have come before the court, where a third person, like an architect or an engineer, is appointed, who possesses expert knowledge upon the subject, and who is ordinarily better able to solve the issues involved than the parties directly concerned. The findings of such arbitrators are not absolutely conclusive, but may be impeached for fraud, actual or constructive, by the courts. *Keachie v. Starkweather D. Dist.* 168 Wis. 298, 170 N. W. 236; *Montgomery v. American Cent. Ins. Co.* 108 Wis. 146, 84 N. W. 175; *Borgnis v. Falk Co.* 147 Wis. 327, 133 N. W. 209. In the *Keachie Case, supra,* it was held by this court: "The effect of a provision of this kind is not doubtful. It is well settled in the law. It is not void because it ousts the court of jurisdiction, as earnestly contended by respondents."

Counsel for the contestants rely largely upon the following Wisconsin cases: *Shipman v. State,* 43 Wis. 381, and *Lauenstein v. Fond du Lac,* 28 Wis. 336. In the *Shipman Case, supra,* a board of building commissioners was authorized by ch. 39 of the Laws of 1870 to accept plans and specifications for the construction of a part of the Northern Hospital, and to supervise such construction. The law also provided for the appointment of a building superintendent to act in an

advisory capacity as an architect.  It was held in that case
that the commissioners were charged with the duty not only
to procure a proper plan and to enter into a proper building
contract, but to see that the building was completed accord-
ing to such contract, and this duty they could not wholly
devolve upon the superintendent.  The court held:

"They [the commissioners] might have rejected the plans
submitted and called for others.  They were made the judges
of his [the superintendent's] plans and of their sufficiency.
The commissioners, not the architect, had to determine the
plan. . . . They were the judges of the sufficiency of his
superintendence, and could have dismissed him at pleasure.
. . . But so far as the plans were equally intelligible to the
commissioners and the plaintiff, . . . the commissioners as-
sumed responsibility for the plans when they adopted them.
And so far as defects of construction in the building were
equally open to detection by the commissioners and the plaint-
iff, on the completion of the building, and so far as these
pleadings disclose, the commissioners assumed responsibility
for them when they accepted the building."

It will thus appear that under the express wording of the
statute the sole duty of accepting plans and of supervising
the construction vested in the commissioners.  This duty
could not be delegated on defects which were as equally de-
tectable by the commissioners as by the superintendent.  In
other words, the opinion holds expressly that where the mat-
ter involved one of expert knowledge which was possessed
by the superintendent but was not within the knowledge of
the commissioners, the commissioners could have relied en-
tirely upon the expert.  Furthermore, in that case there was
an express delegation of power and authority in the commis-
sioners by virtue of the statute, which does not exist in the
instant case.

In the *Lauenstein Case, supra,* the express power to pur-
chase a schoolhouse site was by law vested in the common
council and in a board of school commissioners, and it was
there held that these two bodies alone could exercise such

powers, and that they could not be delegated to a board of public works without an express grant of legislative power so to do.

Sec. 1379—10c, sub. 1, of the Statutes of 1919 provides as follows:

"All proceedings under the drainage district law are equitable in their nature. The court shall at all times have supervision over the commissioners and may require them to report on any matter connected with their duties and after hearing may remove any commissioner from office for neglect of duty, malfeasance in office or other good cause. The court may in any proceeding bring in new parties upon such terms as shall be just with like force and effect as if they were original parties to said proceeding."

It is argued by the contestants that all acts and proceedings under the drainage act are subject to the equitable jurisdiction of the court, and that therefore a submission to arbitration in the form provided for by the contract deprives the court of an essential part of its equitable jurisdiction. When drainage proceedings are begun, the landowners are all made parties, and this was done in the instant case. There is no express mandatory provision of the statute which requires notice to be served upon all the landowners in all cases thereafter, with respect to the various acts and proceedings involved in the construction of a drainage ditch. The owners, being vitally interested in the construction of the ditch, may at all times appear in the proceeding and are entitled to be heard. The court, in the exercise of its equitable powers, may direct that special notice be given to them in order to permit them to be heard, and they may be specially impleaded upon the application of the commissioners, or upon their own application, or by the court upon its own initiative; but otherwise the commissioners represent them.

Independent of the statute, the court in the exercise of its equitable jurisdiction has broad discretionary powers to prevent inequitable results and to promote equity, and it may

extend the proceedings to all such matters as it may deem necessary in order that the conscience of the chancellor may be fully advised before approving or disapproving any acts affecting the interests of the owners. The proceedings in connection with a drainage ditch are statutory and the remedies involved are statutory, therefore the proceedings and remedies plainly outlined by the statute must be followed; but inherently, such proceedings and remedies are equitable in their nature, and the legislature has seen fit to so denominate them. Therefore the conclusion follows that inasmuch as the legislature had for its purpose the accomplishment of certain definite and specific ends in the enactment of the drainage district statutes, it expressly or by necessary implication vested in the court the usual and ordinary powers of a court of equity, which include direction, supervision, and ratification.

Subject to certain restrictions, the statute contemplates a written contract. The legislature, however, has not seen fit to include within the statute a prohibition to submit certain disputed matters to arbitration. The commissioners are vested with the usual powers of corporations to sue and to be sued. Therefore, in accordance with the general law as established by the overwhelming authorities both in this state and elsewhere, it is recognized under such circumstances that the commissioners can submit certain disputed matters for determination to an arbitrator or arbitrators; and an examination of contracts entered into by commissioners clearly reveals the fact that such a provision is universally included in drainage district contracts. If the drainage statutes contemplated an order or direction of the court in each of the innumerable acts involved in the construction of a drainage ditch, the performance by the court of its other jurisdictional matters, for the time being, would become prohibitory, and the drainage act itself would become impracticable.

The right or authority of a municipal or *quasi*-municipal corporation (and the instant drainage district has been held a *quasi*-municipal corporation in *McMahon v. Lower Baraboo River D. Dist.* 184 Wis. 611, 200 N. W. 366) to submit matters of expert knowledge like those herein involved to an expert or experts for arbitration, is quite generally recognized by the authorities. The only restrictions in the statutes which bind the commissioners are contained in sec. 1379—31*c*. The arbitration clause in the contract was inserted therein because it was realized that the ordinary body of laymen who are appointed as drainage commissioners are incapable of performing the expert functions of an engineer. The mathematical computations involved in determining the quantity of the soil or other substances to be removed lie within the field of educated and trained civil engineers, and the mathematical computations depend upon the removal of substances so irregular and complicated in form as to baffle the comprehension of the ordinary layman. This field of computation belongs to a science which has been developed and perfected during the ages, and it is a matter of general knowledge that as a rule the ordinary grading contractor, with years of experience in the pursuit of his business, relies not upon his own knowledge, but upon the advice of a competent and experienced civil engineer. The existence of such a situation is largely responsible for the development of the doctrine in the law (and such development, like many others, is based upon necessity) that where a corporation, whether public or private, is not expressly prohibited from submitting certain matters of this kind to arbitration, and where such corporations have the power to sue and to be sued, arbitration may be resorted to. Such arbitration provisions in a contract are in harmony with the modern tendency of the law, which is designed to avoid as much as possible litigation in courts; and they also serve the purpose of

procuring a speedy determination when litigation results. Arbitration should therefore be encouraged rather than discouraged.

In 2 Ruling Case Law, pp. 357, 358, it is said:

"Corporations have the same power as individuals to submit their controversies to arbitration. . . . A municipal corporation, unless restricted by its charter, has the power to submit any controversy to arbitration and the legislative body thereof has implied power to bind the corporation by such a submission. This is said to be a necessary incident to its capacity to prosecute and defend suits at law."

In the annotations found in 40 A. L. R. 1370 and subsequent pages, numerous authorities will be found recognizing such power as to cities, counties, towns, school districts, and *quasi*-municipal corporations. As to a city it is there said by the editor:

"It is well established that a city has the power to submit to arbitration any claim asserted by or against it, whether based on contract or tort, in the absence of a statutory prohibition. This power is based on the right to contract and the right to maintain and defend suits."

In *Kane v. Fond du Lac*, 40 Wis. 495, it is said:

"That a municipal corporation may, unless restricted by its charter, lawfully submit a disputed claim against it to arbitration, and that the common council of the defendant city had ample power to do so in the present case, we cannot doubt."

In *Brady v. Brooklyn*, 1 Barb. 584, it is said: "Where there is a capacity to contract, with a liability to pay, there is generally a power to arbitrate."

This power is also possessed by an incorporated road district. *Gage & Spencer v. Road Improvement Dist.* 159 Ark. 642, 252 S. W. 922. Likewise "the overseers of the poor of a county who are made a *quasi*-corporation with power to contract and to sue and to be sued, may submit a claim asserted by them to arbitration." *Chapline v. Overseers of the Poor,* 7 Leigh (Va.) 231.

A number of errors are assigned by the learned counsel for the contestants which have reference to certain alleged irregularities in the arbitration proceedings. An examination of the record discloses that the parties who appeared in such proceedings were the necessary parties; that an open hearing was had, in which all parties had the right to participate; that the subject of the arbitration was extensively and minutely entered into; that, in addition to the oral testimony adduced, there were examinations made of the district by expert engineers, which included the district engineer, the engineer of the contractor, and also the state engineer; that days were spent in arriving at a proper conclusion with respect to the intricate calculations involved; and that, based upon the testimony, the personal examinations, and the computations of the engineers, the arbiter arrived at his conclusions. There was no evidence of fraud, or of mistake which might constitute constructive fraud, or misconduct, revealed. An agreement to arbitrate is a contract in itself, and when the parties interested enter into such a contract, and the arbitrators proceed upon the basis of such a contract, the parties are in no position thereafter to complain, especially where no exceptions have been reserved, and where the conduct of the proceedings was such as to manifest approval on the part of all of the participants. Even though the proceedings are in the nature of the old-time common-law proceedings provided for in arbitration matters, they are nevertheless binding. *Montgomery v. American Cent. Ins. Co.* 108 Wis. 146, 84 N. W. 175; *Knickerbocker v. Beaudette G. Co.* 190 Wis. 474, 209 N. W. 763; *Darling v. Darling,* 16 Wis. 644; *Winne v. Elderkin,* 2 Pin. 248. The findings of the court sustaining the arbitration therefore meet with our approval.

The trial court, having sustained the validity of the arbitration clause heretofore set forth and discussed in this opinion, ordered an additional assessment upon the lands contained in the drainage district, and that out of the pro-

ceeds of such assessment the sum of $4,635.20, the balance found due to the contractor on the performance of his contract, be paid. When the district was organized on October 6, 1919, the court by its order confirmed assessments of benefits in the sum of $45,944.71, and an assessment for cost of construction in the sum of $30,629.81, and the commissioners were authorized to borrow in order to meet the cost of construction, upon the bonds of the district, said sum of $30,629.81. Prior to the order confirming the assessment of benefits and the cost of construction, an indebtedness of $5,300 had been incurred by the commissioners as a preliminary expense, which under the statutes became the obligation of the district upon the confirmation of the order approving the assessments of benefits and cost of construction; and upon such approval, under and pursuant to the provisions of sec. 1379—30, Stats. 1919, such amount for preliminary expense became a part of the cost of construction, and is therefore necessarily included within the $30,629.81 aforesaid. Subsequent to the order of October 6, 1919, additional orders for assessments, in the sum of $605 and $900, were made by the court for repairs and necessary incidental expenses.

The foregoing were the only orders for assessments made by the court prior to the final order from which this appeal is taken. After deducting the sum of $5,300 aforesaid from the total assessment for cost of construction, there remained a balance of $25,329.81. It is therefore argued that inasmuch as the contractor, prior to the application for the additional assessment herein complained of, received the sum of $27,620.93, as appears from the evidence, the additional amount of $4,635.20 brings the excess over the previously confirmed assessment for cost of construction to the amount of $7,926.32. Briefly stated, counsel for the appellant landowners take the position that when the amount of the assessment for cost of construction has been exhausted, no further liability can be incurred by the district unless there

is first duly entered an order providing for an additional assessment for cost of construction.

Sec. 1379—30, sub. 1, Stats. 1919, is the section in the district drainage act which provides for additional assessments, and reads:

"If in the first assessment for construction . . . the commissioners shall have reported to the court a smaller sum than is needed to complete the work of construction or if in any year an additional sum is necessary to pay the principal or interest on lawful indebtedness of such district, additional assessments on the lands and corporations benefited, proportioned on the sum of all benefits which have been confirmed by the court and are then in force, shall be made under the order of the court or presiding judge thereof."

The language of this section is significant. The condition imposed thereby consists merely of the inadequacy of the original fund represented by the assessment for cost of construction. It implies an exhaustion of such fund, the incompleteness of the project, and the necessity for further funds. The statute does not, expressly or impliedly, prohibit further construction by the contractor before an additional assessment is levied; neither is there an intimation contained therein to the effect that no further liability can lawfully be created unless, prior to the continuation of construction, an additional order for assessment be made. If the legislature had such an alleged requisite in mind, the thought could readily have been expressed in plain and unequivocal language; but this it failed to do. It cannot for a moment be assumed that the contractor, as a prerequisite to his right to compensation under the contract, shall keep minute tab upon the financial condition of the fund, in so far as it concerns a prior assessment for construction, and that he must cease all operations immediately upon the exhaustion of such fund. Ordinarily a project like a drainage ditch must be constructed with all due and convenient speed. The ditch itself must originate with the owners of the land, and must be deemed a necessary project for the improvement of such owners'

lands, notwithstanding the requirement of the public health which is the foundation of the legislation. The only limitation placed upon the project consists of the assessment for benefits; and as long as this limitation is not exceeded, it must be assumed that the parties interested are willing to go forward until that limitation is reached. To hold otherwise would in most instances involve a large expenditure of money for which no corresponding advantage or benefit is secured. This represented unquestionably, as it appears from the evidence, the views of the landowners themselves and of the commissioners, for, notwithstanding the fact that the matter of the assessments and of the expense connected with the project was clearly indicated by the public records, no protest whatsoever was made by any of the parties interested until many years after the substantial completion of the ditch, and when it became apparent that the original designs could not be carried out to their formal conclusion, by the intervention of natural causes for which neither the contractor nor the commissioners nor the landowners were responsible.

The experience of those interested in this drainage ditch is not unlike that involved in many other enterprises. While the enterprise is in its infancy the participants therein are sanguine, optimistic, and enthusiastic. They can see only the accomplishment of their visionary dreams. Everything moves on smoothly until disaster or total or partial failure is realized, and then, in accordance with the instincts of humanity, those originally interested are ready to desert and scuttle the ship; and not only that, but are willing to cast the blame upon every one else but themselves. But, even though we assume that the statute reasonably warrants a construction that a prior additional assessment for benefits be necessary, the additional expenditures over the original cost of construction were actually incurred, and the landowners and the commissioners not only acquiesced in the same, but will-

ingly became the recipients of the benefits, without criticism and without protest, and therefore, under the authorities which will be referred to herein in another branch of this case, they are now estopped in law.

It is true, as the learned counsel, Mr. Grady, representing himself herein as a landowner, argues, that sec. 1379—31*b*, sub. 1, expressly provides that the court may authorize the commissioners to borrow money in advance of an assessment, for preliminary expenses. The establishment of a drainage ditch involves such an expense, and, in fact, the feasibility of such a project could not well be established without the expense of a preliminary survey, etc. It is also true that if it becomes apparent that the cost of construction of the ditch exceeds the assessed benefits, then the whole proceeding is stranded upon the rocks, and those incurring the preliminary expenses are themselves obliged, individually, to shoulder the bill. This assumption of personal liability must necessarily follow under the law, because unless it be first ascertained and reported, and such report confirmed, that the cost of construction is within the assessment for benefits, the court loses all further jurisdiction in the matter. But in this case the original assessment for cost of construction was well within the benefits, and therefore, when these original assessments were confirmed, the court's jurisdiction was established and the project became one for further execution.

Counsel Grady in his brief relies largely upon the case of *Winkelmann v. Moredock & Ivy L. D. Dist.* 170 Ill. 37, 48 N. E. 715. He argues that our drainage law has been taken almost bodily from the statutes of the state of Illinois, and that, inasmuch as the Illinois court in the case above cited has construed the statutes of that state in a manner harmonizing with his views, Wisconsin is bound by such construction. But a comparison of the Illinois statute and the Wisconsin statute will reveal the fact that a vital differ-

ence exists upon the crucial point involved herein. In the opinion in the *Winkelmann Case* it is said:

"But, aside from the indefiniteness as to nature and amount thus referred to, the statute seems to provide a particular mode *in which alone the district is authorized to incur any indebtedness.* Sec. 36 provides that 'the commissioners may do all acts that may be necessary in and about the surveying, laying, constructing, repairing, altering, enlarging, cleaning, protecting and maintaining any drain, ditch, levee or other work for which they have been appointed, including all necessary embankments, protections, dams, and side drains, clearing out and removing obstructions from natural or artificial channels or streams within or beyond the limits of the drainage district, procuring or purchasing riparian rights by agreement with the owners thereof;' and it, at the same time, provides that the commissioners 'may use any money in their hands arising from assessments for that purpose.' By sec. 36 the commissioners are thus limited to the use of money in their hands, arising from assessments, for the purpose of accomplishing the objects therein mentioned. . . . These provisions of the act clearly indicate that the commissioners have no power to contract debts over and above the amount of the assessment. According to the allegations of the present petition, the indebtedness for which it is sought to levy the assessment largely exceeds the whole amount of the original assessment of 1883, and, by consequence, exceeds the amount of the unpaid portion of said former assessment. The commissioners have no power to create the indebtedness in advance, and then levy an assessment for the purpose of meeting it. This is so because the property owners have a right to be heard as to any act of the commissioners materially affecting the character or extent or cost of the improvement. *Badger v. Inlet D. Dist.* 141 Ill. 540, 31 N. E. 170."

This decision of the Illinois court has not been overruled by subsequent cases, and we are of the opinion that it demonstrates the inapplicability of this decision to the instant case.

The trial court, after reciting in its findings of fact the essential proceedings which led up to the organization of the drainage district and the confirmation of the report of the

commissioners upon the assessment for cost of construction and of benefits, and of the entry into the contract and the terms thereof, in the eighth paragraph thereof finds:

"That many of the owners of land in said district, with the knowledge of all owners of land in said district and of said commissioners, voluntarily paid directly to the First National Bank of Baraboo, for the use and benefit of said petitioner, Ed Schirmer, sums aggregating $11,636.85, pursuant to their subscriptions in writing made prior to October 16, 1920, to induce said Ed Schirmer to enter into said written contract with said commissioners on October 16, 1920, at the lowered rate of 8½c per cubic yard as compensation for the first 300,000 cubic yards of material (except solid rock) and 12½c per cubic yard in excess yardage to be removed by him in the performance of said contract.

"That said sums, aggregating $11,636.85, were received and accepted by said petitioner as payments by said landowners in addition to the assessments, to be levied against their lands and the corporations benefited, for the payment of the indebtedness of said district for construction, repairs, and maintenance of said drainage ditch."

In its fifth conclusion of law the trial court held:

"That the voluntary contributions made as described in the findings of fact Nos. 8 and 9 are not assessments for costs of construction, nor to be considered as a part thereof in determining the amount of additional assessments that may be levied for construction on the lands and corporations benefited herein, proportioned on the sum of all benefits, which have been confirmed by the court and are since then in force, for the purpose of paying to the contractor, Ed Schirmer, herein, the amount herein determined to be due him as a lawful indebtedness of said district."

The contestants herein strenuously assert that such voluntary contributions must be considered as a part of the assessments, and that, when so considered, the assessments for benefits have been exceeded, and that therefore the court lost jurisdiction to further proceed in the matter, and that the additional assessment for benefits provided for in the final order cannot stand.

All proceedings pertaining to the creation and construction of a district drainage ditch under the general statutory scheme at all times are deemed to be under the eye of the court, and this is emphasized by the legislature in its enactment, wherein it denominates such proceedings as equitable in their nature. True, the court cannot act or proceed contrary to the express will of the legislature, nor can it exceed the confines delineated by the law-making body, for the reason that the entire undertaking is responsible primarily for its being to its creator, the legislature. But in the creation of this project the legislature realized the impossibility and the impracticability of anticipating all of the situations which might arise during the life of a drainage project, and therefore a large field was permitted to remain open, which was designed for the functioning of the court, and thus, in order to carry out the purpose of the legislature, the supreme power of supervision and direction, in all matters in which it was not restricted, was vested in the court.

When the original bids were submitted it became apparent that the drain could not be constructed for a sum within the amount of the assessment for benefits. It was therefore apparent to the court and to all parties interested that the project would come to naught unless a modified proper bid could be obtained. The eagerness of the landowners thereupon manifested itself by the ingenious subscription agreement which was executed, under the terms of which it was contemplated to raise a large sum of money to insure the prosecution of the construction. The record clearly discloses that all parties interested were familiar with the law as it appertains to a district drainage ditch, and, whether they were so familiar or not, the presumption would nevertheless obtain. It also clearly appears that it was the opinion of all interested that the amount so paid by private subscription of landowners should not be considered a part of the cost of construction, and therefore the method was adopted which is outlined by the findings above set forth. The bid of the

contractor was therefore reduced and the amount thereof incorporated in the written contract, and as so reduced and modified the cost of construction remained well within the assessment of benefits. This was known to the court, to the commissioners, to the landowners, and all others who might have an interest. Therefore, when the court confirmed the assessments both for cost of construction and for benefits, it did so while possessing full knowledge of the situation. No fraud was therefore perpetrated upon the court, and no claim to that effect could have a standing herein under such circumstances.

The question of whether voluntary private subscriptions can be received in the construction of a drainage ditch in order to prevent a collapse of the scheme because the assessments for construction would otherwise exceed the assessment of benefits, has not been decided by this court, and the situation disclosed in the instant case is such that we do not deem it necessary to determine that matter in this opinion. The outstanding and predominant feature, however, in the case consists of an actual construction by the court, which was tacitly acquiesced in by all persons interested, to the effect that the voluntary subscriptions should not be considered and were not considered as a part of the assessment for the cost of construction. The voluntary subscriptions thereupon were paid by the landowners and were received by the contractor, and the work proceeded at a large cost. Under these circumstances, where the very acts of the subscribing landowners and the tacit consent of the balance thereof were the inducing cause of the creation of the indebtedness which resulted in the carrying out of an intently desired project, should the landowners now be heard to say that the scheme was fraudulent or that this final assessment is void because the voluntary subscriptions became a part of the cost of construction? Such a holding would be contrary to every proposition of law applicable to such a situation, and would wipe out one of the greatest instrumentalities in the ad-

ministration of justice which is recognized by courts in the form of an estoppel. All of the assessments actually made were such as the court had the right to make; and whether the moneys were procured irregularly, or so expended, so long as they actually went into the project and operated to promote the same, in view of the actual and tacit consent of all parties interested, who became and were the recipients of the benefits of the expenditure of these moneys for a long period of years, their belated protests will not now be heard. *Murphy v. Paull,* 192 Wis. 93, 212 N. W. 402; *Ellefson v. Smith,* 182 Wis. 398, 196 N. W. 834; *Frederick v. Douglas County,* 96 Wis. 411, 71 N. W. 798; *Thomson v. Elton,* 109 Wis. 589, 85 N. W. 425; *Koch v. Milwaukee,* 89 Wis. 220, 62 N. W. 918; *First Wis. Nat. Bank v. Catawba,* 183 Wis. 220, 232, 197 N. W. 1013; 9 A. L. R. 894, 895, 896; note to 10 L. R. A. 285; 60 L. R. A. 217.

The principles thus declared in this opinion make it unnecessary for the court to consider the other assignments of error excepting only the one which involves the plea of *res adjudicata.*

The eleventh finding of fact, in part, is as follows:

"That on April 30, 1923, one John Staudenmeyer, a landowner in said district, appeared in said court as a remonstrant to the said petition of said commissioners for an assessment to complete the ditch.

"That on June 13, 1923, an order was entered in the said court by Hon. Chester A. Fowler, judge presiding, which is as follows:

"The above entitled matter being before the court; and John Staudenmeyer and others having remonstrated against the granting of the petition; and the court having heard the testimony adduced in support of and in opposition to the petition and having taken a view of the portion of the river where it is proposed to continue excavations and the adjoining lands and having heard the arguments and received the briefs of counsel pro and con:

"The court finds as facts:

"1. That the proposed continued excavation would not

extend to mouth of the Baraboo river, as the plans of the district and the contract for excavation provide.

"2. That the commissioners intend and propose not to extend the excavation below the Funk bridge in any event, so that the contract for excavation will in any event be breached.

"3. That the proposed extension of excavation is not desired by any of the abutting owners through whose lands the same would extend.

"4. That the proposed extension of excavation is not desired by any other landowners of the district.

"5. That the proposed extension of excavation will not beneficially affect, to any material or appreciable degree, either the lands through which it would pass or other lands of the district.

"It is therefore ordered and adjudged that the said application is denied and the said petition is dismissed."

It becomes clear from the foregoing order that the court denied the application for additional assessments upon the sole ground that the completion of the project, owing to unforeseen and natural causes, was not feasible, and that no further assessments for such completion should be made. It is here to be noted that the assessments in the instant case were made in order to meet the expenditures already incurred.

*By the Court.*—The order of the court appealed from is affirmed.

FOWLER and FRITZ, JJ., took no part.

A motion for a rehearing was denied, with $25 costs, on June 24, 1929.